**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 1, 2015**

# In the Court of Appeals of Georgia

A15A0374. OGLETHORPE POWER CORPORATION et al. v.
    THE ESTATE OF JAMES FORRISTER et al.

BO-018

A15A0375. OGLETHORPE POWER CORPORATION et al. v.
    THE ESTATE OF JAMES FORRISTER et al.

BO-019

A15A0376, A15A0377, A15A0522. PARADISE LOST, LLC v.
    OGLETHORPE POWER CORPORATION et al., and vice
    versa.

BO-020,21,
25

BOGGS, Judge.

These cases, involving claims of nuisance against the owner and operator of the Sewell Creek Energy Facility by numerous surrounding landowners, appear before us for the second time. The relevant facts are found in the first appearance of these litigants, *Oglethorpe Power Corp. v. Forrister*, 303 Ga. App. 271 (693 SE2d 553) (2010):

> [T]he Sewell Creek Energy Facility is a gas-fired "peaking" power plant which began operating in 2000. It is owned by Smarr EMC, and

operated by Oglethorpe Power Corporation, both of which are power supply cooperatives formed and operated under OCGA § 46-3-170 et seq. The Sewell Creek facility does not operate continuously, but is designed to generate power only when energy usage exceeds the capacity generated by base and intermediate plants, such as on a hot summer afternoon when the use of air conditioning increases. The facility occupies 25 acres of a 160-acre site, located at the intersection of an underground gas line and an overhead high-capacity electricity transmission line in Polk County. Electricity is generated at Sewell Creek with four gas-fired combustion turbine units, which are variations of jet airplane engines, and which are used in peaking plants because they can be turned on and off in minutes to meet short-term energy demands.

Id. at 272. In *Forrister*, this court affirmed the trial court's denial of summary judgment to Smarr EMC ("Smarr"), the owner, and Oglethorpe Power Corporation ("Oglethorpe"), the operator, on the issue of the proper application of OCGA § 9-3-30 (a), the statute of limitation for trespass or damage to realty. Our Supreme Court granted certiorari and affirmed in part and reversed in part, finding that summary judgment was appropriate as to some, but not all, of the landowners' claims, and providing guidance for trial on the remaining issues. *Oglethorpe Power Corp. v. Forrister*, 289 Ga. 331 (711 SE2d 641) (2011). The cases return to us after a consolidated jury trial on the threshold issue of the statute of limitation, and two

2

subsequent jury trials on the individual claims of two of the landowners. We affirm in the consolidated appeal and one of the two individual appeals, but reverse in the third on the basis of error in the trial court's instructions on the elements of damages. We therefore dismiss the cross-appeals in that case as moot.

In *Forrister*, the Supreme Court held that the power plant is a permanent nuisance, and plaintiffs therefore "are limited to filing one cause of action for the recovery of past and future damages caused by a permanent nuisance. [Cits.]" Id. at 335 (2). As a result, the court held that "the plaintiffs' action would be barred because they did not file their lawsuit until almost seven years after the Sewell Creek plant became operational — unless some new harm that was not previously observable occurred within the four years preceding the filing of their cause of action in 2007." Id. at 336 (3). As to any harm that changed only by degree, or "extent and amount" since the plant began operations, the trial court should have granted summary judgment. Id. at 337 (3). But the Supreme Court agreed with the plaintiffs that summary judgment was inappropriate to the extent that "the record reveals a factual dispute regarding whether a new noise, not previously observable, began in 2004, which requires a trial to resolve." Id. It further held:

> To the extent the trial court found that a factual issue remains concerning whether there was an "adverse change in the *nature*" of the noises and vibrations coming from the plant after the start of the 2004 operating season, the denial of summary judgment was appropriate. Such a change in the type of the noise would constitute a new harm that the plaintiffs did not observe before, and because it occurred within four years of their filing this lawsuit, they would not be precluded from filing suit to recover damages. See Restatement (Second) of Torts § 899, cmt. d. If the jury finds in favor of the plaintiffs, it may grant a single damages award for the harm caused by the new type of noise suffered during the four years before the suit was filed and for all future injuries from this permanent nuisance.

(Emphasis in original.) Id. at 336 (3).

When the cases returned to the trial court, the parties agreed to a two-phase trial, with the first phase consisting of a consolidated trial on the threshold issue of whether a new harm occurred within the limitation period. In the first phase, the trial court submitted a special verdict to the jury in the following form: "We, the jury, find that there: ___ has/ ___ has not been an adverse change in the nature of the noise produced by the Sewell Creek energy facility since February 7, 2003." The jury found that such an adverse change had occurred, and the trial court directed that the "cases will now move forward on individual trials to determine liability and damages." The

4

trial court denied judgment notwithstanding the verdict and a new trial, and Oglethorpe and Smarr appeal in Case No. A15A0374.

In Case No. A15A0375, Oglethorpe and Smarr appeal from the jury verdict in the individual claims of Ronda Forrister and the Estate of James Forrister. In Case No. A15A0376, plaintiff Paradise Lost, LLC appeals from the trial court's rulings on its individual claim for "discomfort and annoyance" as one of the elements of damages for nuisance. In A15A0377 and A15A0522, Oglethorpe and Smarr cross-appeal from the jury verdict on the claims of Paradise Lost, LLC.

*Case No. A15A0374*

1. Oglethorpe and Smarr assert as error the denial of their motions for directed verdict and judgment notwithstanding the verdict. Our standard of review of these claims is well established:

> A directed verdict is proper only if there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. OCGA § 9-11-50 (a). In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict. The standard used to review the grant or denial of a directed verdict is the "any evidence" test. The standard for granting j.n.o.v. is the same as for directed verdict.

5

(Citations and punctuation omitted.) *Grubb v. Woodglenn Properties*, 220 Ga. App. 902, 903 (1) (470 SE2d 455) (1996).

So viewed, the evidence presented at trial shows that individual landowners and users of the property testified that the nature or type of noise produced by the power plant had changed for the worse after 2003. They testified to a range of new noises that were not present in 2003 and before, including vibrations that came in "waves" and sounded like a train, rumbles or rumbling sounds, "small explosions" or booming noises, shaking that penetrated concrete walls, a high-pitched sound or "scream," grinding "like two pieces of metal rubbing together," a whining noise which one witness described as "totally different," and "a squealing noise."

Plaintiffs also presented the testimony of an acoustical engineer who played a recording of sounds from the plant in 2012 for the jury. He then played for the jury segments of the 2012 sounds alternating with segments prepared from earlier 2001 recordings. He prepared charts for the jury showing lines representing different noise frequencies detected by his measuring equipment, and pointed out a noise that was present in 2012 but not in 2001. He also testified that this was "absolutely" a change in the character of the noise. He added that by taking many more samples he was able

6

to conclude that the fluctuations in sound were unlikely to be random, and that "it is a 99 percent chance that something has changed at the plant."

A second acoustical engineer also testified for the plaintiffs. He visited various properties around the plant approximately 30 times, beginning in 2001. He testified that he was called to the area in 2011 by property owners who reported that a new "screeching noise" or "tunnel sound" was occurring. At that time, the engineer heard a "whistle" that he had never heard before. He made a recording of the noise and created graphs depicting the various frequencies of sounds generated by the plant in 2002 and on that occasion in 2011. He testified that the later chart showed a new "spike" or line corresponding to the whistling noise that was not present in 2002.

Oglethorpe and Smarr argue that this evidence was insufficient to establish a change in the nature of the noises produced by the power plant, but merely one of "extent, amount, or degree." They point to inconsistencies in the testimony of appellees' experts, as well as to contradictions in the testimony of the individual plaintiffs and witnesses.[1] They also point out that many of the witnesses and plaintiffs

[1]At oral argument, Oglethorpe and Smarr suggested that appellees' witnesses tailored their testimony at trial to the Supreme Court's ruling in *Forrister*. But one of the plaintiffs died before that opinion was issued, and he testified by video deposition in 2007 that the nature or type of noise changed for the worse starting in 2004, and that testimony was presented to the jury.

did not live on the property full time, or were absent for work or other purposes for substantial periods of time, thus impairing their ability to observe whether noises were new or had occurred before the limitation period but were simply unobserved.

However,

> [t]his court does not pass upon the credibility of witnesses, nor the weight to be given evidence on disputed facts. These are questions for the jury. Whether their verdict is contrary to the evidence, or contrary to its weight, or decidedly and strongly against its weight, is a question the law vests in the trial judge's discretion. He may grant a new trial on these grounds, but this court has no such power. Where the trial judge approves the verdict, the sole question for determination by this court is whether there is any evidence sufficient to authorize it. There being some evidence to support the jury's verdict as to damages for nuisance, we find no reversible error.

*City of Lawrenceville v. Heard*, 194 Ga. App. 580, 582-583 (391 SE2d 441) (1990).

Appellants rely upon *Floyd County v. Scott*, 320 Ga. App. 549, 552-553 (740 SE2d 277) (2013), but that decision is inapplicable to the issues here as established by our Supreme Court. In *Scott*, the county connected a "drainage tie-in" to an existing underground culvert in 2003. Id. at 550. The plaintiffs alleged in their original 2011 complaint that flooding of their property began almost immediately after construction in 2003, and one plaintiff testified that she observed water on the

property when it rained. Id. Plaintiffs later amended their complaint to deny any flooding before 2009, and to allege that the harm to their property began in 2009 when trees began falling due to root damage from flooding. Id. at 550-551. We reversed the trial court's denial of summary judgment, holding that plaintiffs' earlier allegations and testimony constituted admissions against interest. Their claim for increased flooding as a result of the county's work accordingly accrued more than four years before their complaint was filed and was barred by the statute of limitation. Id. at 552-553 (1).

Here, in contrast, our Supreme Court has already held that summary judgment was inappropriate as to claims for adverse changes in the nature of the noise within the limitation period. And, though the evidence presented at trial was in conflict, some evidence supports the jury's verdict. We therefore must affirm under our "any evidence" standard of review.

*Case No. A15A0375*

2. In this appeal, Oglethorpe and Smarr appeal from the jury's verdict in the individual claims of Ronda Forrister and the Estate of James Forrister. They assert

9

that the evidence was insufficient to support the jury's verdict. We find that the evidence was adequate to support the verdict, and we therefore affirm.

(a) Oglethorpe and Smarr contend that the Forristers failed to produce evidence of a new nuisance within the limitation period. But the evidence of a new nuisance, or an adverse change in the nature of the noises and vibrations produced by the plant, was supported by evidence very similar if not identical to that presented in the consolidated trial. The Forristers and others once again testified that the noises and vibrations produced by the plant became worse during the limitation period. One neighbor, who is an aircraft mechanic with experience maintaining jets and turbines, explained that "as the engine gets older you'll get different sounds because flanges and everything start leaking as any engine gets older and any machine gets older, the sounds will change. These machines now are 12, 13 years old." Two expert witnesses once again testified regarding the changes in the sound from the plant, and again played recordings and displayed charts for the jury. One expert also attributed the change in the noise to "wear and tear over time." As we noted in Division 1, supra, though the evidence presented at trial was in conflict, some evidence supports the jury's verdict. Therefore, we must affirm under our "any evidence" standard of review.

(b) In a related enumeration of error, Oglethorpe and Smarr contend that the jury's finding of an adverse change as of a specific date was unsupported by the evidence. The parties agreed to a provision in the special verdict form to be completed if the jury determined that the Forristers suffered damages based upon a change after February 7, 2003: "When after February 7, 2003 did an adverse change first occur? _____, 20 __." As part of its verdict, the jury filled in the blank with "July 25, 2005."

Having agreed to the inclusion of a blank directing the jury to specify a day and date in the verdict form, Oglethorpe and Smarr "will not be heard to complain of error induced by [their] own conduct, nor to complain of errors expressly invited by [them] during the trial of the case." (Citations and punctuation omitted.) *Clark v. Stafford*, 239 Ga. App. 69, 72 (2) (522 SE2d 6) (1999) (appellant elected to give jury option of only two choices of location of boundary line in special verdict form). "And under our holding in *Clark* [they] cannot now challenge the sufficiency of the evidence underlying a finding proposed by the verdict form." *Dover v. Higgins*, 287 Ga. App. 861, 867 (2) (652 SE2d 829) (2007). Moreover, "[a] jury's verdict is presumed to be valid and should, if possible, be construed as such." (Citation and punctuation omitted.) *Voxcom, Inc. v. Boda*, 221 Ga. App. 619, 620 (472 SE2d 155)

11

(1996) (in awarding interest for breach of contract in amount less than that stipulated by parties as one year's severance, jury could have found breach occurred at later date).

Oglethorpe and Smarr argue from the "Forrister log" – a typed transcription of notations that the Forristers kept regarding their perception of noise from the plant – that there is no evidence of an adverse change on July 25, 2005 because the notation for that date simply reads "ran" with no other description of the noise. But it appears from the log that nothing was recorded for ten days before July 25, and that July 25 marks a beginning point of significant changes in the log: the entries were made much more frequently from that date until the end of September and the warm weather. In addition, before that date the log contains only two entries noting volume: one for "very loud" for one day in July, 2004, and "loud" on July 2, 2005. From July 25, the Forristers noted the plant running daily until July 28, 2005, and the entries noting "loud," "ran loud," "real loud," and "very loud" became far more frequent, comprising almost half the entries made for the rest of the year. Taken in conjunction with Mrs. Forrister's testimony that she noticed a change for the worse in 2005, and charts presented by Oglethorpe and Smarr showing a significant increase in plant activity shortly after the middle of July 2005, this is evidence from which the jury

could conclude that July 25 marked the beginning of a substantial, adverse change in the nature of the noise from the plant.

(b) Oglethorpe and Smarr next argue that the Forristers presented no evidence of damages for diminution in value of their property, contending that their expert witness on the issue of value failed to meet the standard of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993) and former OCGA § 24-9-67.1 [now OCGA § 24-7-702,][2] and that the evidence was in any event insufficient. We disagree.

> Questions concerning the admissibility of expert opinion generally are committed to the sound discretion of the trial courts, and questions of the admissibility of expert opinions under former OCGA § 24-9-67.1 are no different. Whether an expert opinion ought to be admitted under former OCGA § 24-9-67.1 is a question that is especially fit for resolution by a trial court because it requires a consideration of the facts and data upon which the opinion is based, whether the opinion is a product of reliable principles and methods, and whether the opinion was

---

[2]Both OCGA § 24-7-701 (b), dealing with lay witness testimony, and OCGA § 24-7-702, dealing with expert opinion testimony, were recodified in essentially the same language as that of the former Georgia Evidence Code. Our analysis therefore remains the same. *Hankla v. Postell*, 293 Ga. 692 n.1 (749 SE2d 726) (2013).

reached by a reliable application of those principles and methods to the facts of the case.

(Citations, punctuation, and footnote omitted.) *Harper v. Ameris Bank*, 326 Ga. App. 67, 69 (2) (755 SE2d 872) (2014). There, the witness whose testimony was at issue was a certified real estate appraiser in Georgia, had extensive experience appraising properties, and his conclusions were subject to thorough and sifting cross-examination. Challenges to the factual basis of his opinions or his knowledge and expertise with regard to certain issues went to the weight, not the admissibility, of his testimony, and permitting him to testify was not an abuse of discretion. 326 Ga. App. at 69-70 (2).

Here, the witness likewise testified that he was a certified real estate appraiser, with 22 years of experience in and around Polk County, particularly in the appraisal of rural property. He described at length the methodology he used to arrive at a reduction in value for the property at issue as a result of the nuisance and his reasons for employing it, and testified to a percentage reduction in value as to each parcel of property owned by the Forristers, varying between 35 and 45 percent depending upon proximity to the plant, improvements, and marketability.

As in *Harper*, supra, Oglethorpe and Smarr's contentions go to the factual basis of the witness' opinions, not his qualifications or methodology. They conducted a full and searching cross-examination of this witness, in which they challenged his methodology in detail. They also presented their own real estate appraiser, who testified to a range of reduction in value between 0 and 20 percent, based upon his own observations and experience. His methodology was likewise attacked on cross-examination.

> The appropriate standard for assessing the admissibility of the opinion of the expert is not whether it is speculative or conjectural to some degree, but whether it is wholly so; clearly, [the witness'] testimony was not wholly speculative or conjectural. Moreover, even if his opinion was based on inadequate knowledge, that went to the credibility of the witness rather than the admissibility of the evidence. [Appellants] ha[ve] not shown that [the witness'] testimony was not the product of reliable principles and methods. We discern no abuse of the trial court's discretion in qualifying him as an expert or allowing his testimony.

(Citations and footnotes omitted.) *Savannah Cemetery Group v. DePue-Wilbert Vault Co.*, 307 Ga. App. 206, 213 (3) (704 SE2d 858) (2010).

Moreover, "a witness need not be an expert or dealer in real property, but may testify as to its value if he has had an opportunity for forming a correct opinion.

15

OCGA § 24-9-66 [now OCGA § 24-7-701 (b)]." (Citation and punctuation omitted.) *Dept. of Transp. v. Jordan*, 300 Ga. App. 104, 106 (684 SE2d 141) (2009). "[A] nonexpert can offer an opinion of the value of real property, even if that opinion is based on hearsay. . . . The fact that the opinions were based upon hearsay goes merely to their weight and not their admissibility." (Citations and punctuation omitted.) *Perry v. Perry*, 285 Ga. App. 892, 893 (1) (648 SE2d 193) (2007) (reversing trial court's grant of new trial as to damages; lay witness' opinion of value was probative even if based on hearsay.) See also *Harper*, supra, 326 Ga. App. at 69-70 (2) ("Direct testimony as to market value is in the nature of opinion evidence. One need not be an expert or dealer but may testify as to its value if he has had an opportunity for forming an opinion." (Citation and footnote omitted.)

> [A] trial court's approval of a jury's verdict as to damages creates a presumption of correctness that cannot be disturbed on appeal absent compelling evidence, and a reviewing court is powerless to interfere unless it is clear from the record that the verdict of the jury was prejudiced or biased or was procured by corrupt means. The jury's award was well within the range of the undisputed and competent evidence before it.

(Citations and punctuation omitted.) *Jordan*, supra, 300 Ga. App. at 106-107. The jury appears to have thoughtfully considered the testimony of both real estate

16

appraisers in arriving at their verdict, as they awarded damages for diminution in value in an amount greater than that proposed by Oglethorpe and Smarr's expert but less than that testified to by the Forristers' expert. This award was well within the range of the evidence, and we will not disturb it on appeal.

(d) Oglethorpe and Smarr challenge the sufficiency of the evidence as to punitive damages. In the first portion of the bifucated trial, the jury found that Oglethorpe and Smarr "showed a willful and wanton disregard for Plaintiffs' property rights" and that the Forristers therefore were entitled to punitive damages. After a separate hearing on the issue of punitive damages, the jury found that Oglethorpe and Smarr did not act with a specific intent to cause harm, and awarded damages in the amount of $250,000. See OCGA § 51-12-5.1 (g).

Punitive damages may be awarded in a case of nuisance when clear and convincing evidence shows that the defendant's actions demonstrate "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." (Citation, punctuation, and footnote omitted.) *Tyler v. Lincoln*, 272 Ga. 118, 120 (1) (527 SE2d 180) (2000). To support the award of such damages,

[t]here must be aggravating circumstances or outrage, such as spite, malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton. In this sense, conscious indifference to consequences means an intentional disregard of the rights of another, knowingly or wilfully.

(Citations omitted.) *COMCAST Corp. v. Warren*, 286 Ga. App. 835, 839 (2) (650 SE2d 307) (2007). And "a jury may award punitive damages even where the clear and convincing evidence only creates an inference of the defendants' conscious indifference to the consequences of their acts." (Citation, punctuation, and footnote omitted.) *Weller v. Blake*, 315 Ga. App. 214, 219-220 (3) (a) (726 SE2d 698) (2012).

Construed to support the jury's verdict, the record shows that, while the plant was under construction, Oglethorpe and Smarr sent a letter to surrounding residents, including the Forristers, assuring them that "[n]oise and visual impact studies will insure that the plant will be as unobtrusive as possible." Witnesses testified that low-frequency noise in gas turbines was recognized as a problem in the combustion turbine industry as early as the 1960s, that an article "Beware Low Frequency Noise" appeared in a power industry publication as early as 1973, and that an engineering standard including low-frequency noise was published as early as 1974. Moreover,

18

the technology to ameliorate low-frequency noise was available in the 1990s, before the Sewell Creek facility was built, and use of that technology was "simple engineering best practice to protect the community."

But, despite common knowledge in the industry of problems with low-frequency noise in gas turbines and the availability of the technology to ameliorate it, Oglethorpe and Smarr did not take any substantial steps to reduce low-frequency noise. The project manager for Oglethorpe acknowledged that Oglethorpe had a pressing need for additional generator capacity to close a "gap" in its power supply caused by greater demand in the summer months. He also acknowledged that "we came a little late to the marketplace" in purchasing turbines for the Sewell Creek facility at a time of high demand, and had to take the only turbines available, without any low-frequency noise guarantee. The expert who testified on behalf of Oglethorpe and Smarr at trial was called in before the plant was built "to evaluate some gas turbine machines that they had just bought." Evaluating them only on the basis of "some measurements that their other consultant had made," he concluded that the low-frequency noise was in "a gray area so I called it marginally acceptable." This expert acknowledged that the technology to reduce low-frequency noise was available at the time, but it "costs a lot more money." Although the purchase contract for the

19

turbines provided for "further noise attenuation measures . . . subject to a change order process after further modeling and field tests are performed," the expert acknowledged that he was never asked to do any further tests. Instead, Oglethorpe and Smarr elected to use a less-expensive noise reduction system that was ineffective at reducing the low-frequency noise, "too lightweight," and "a terrible mistake from an engineering standpoint."

Oglethorpe and Smarr's expert acknowledged that, had he been asked, he would have recommended design changes similar to those he recommended for another peaking power plant constructed shortly afterwards. He also acknowledged that, while the design of the second plant "worked beautifully" and there have been no noise complaints there, the Sewell Creek facility in contrast is "not even marginally acceptable." But Oglethorpe's project manager insisted on cross-examination that "we had no reason to" consider invoking the change order provision of the contract because the plant was "acceptable," even though "marginally" so, and in his opinion it remained "acceptable" as of the day of his trial testimony. And while this witness testified on direct that Oglethorpe's and Smarr's investigation showed that "there were no issues that came up" with the turbines and that they "were no big deal in sound issues," he acknowledged immediately afterwards on cross-examination

20

that Oglethorpe and Smarr "did not do any due diligence on whether the . . . machine was noisy or not." He also acknowledged that they received the report from their expert witness in time to make modifications to the contract and ameliorate any noise issues.

In sum, evidence was presented that, despite assurances to their neighbors that the plant would be "as unobtrusive as possible," and despite knowledge in the industry of noise problems associated with gas-fired turbines, Oglethorpe and Smarr, apparently motivated by time and expense concerns, chose to purchase turbines without a noise guarantee, failed to involve their expert in a timely fashion and limited his involvement, and failed to take noise abatement actions allowed under the purchase contract despite the expert's warning that the noise level was only "marginally acceptable." The jury could infer from this evidence that Oglethorpe's and Smarr's actions showed "that entire want of care that would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b). See *Wildcat Cliffs Builders, LLC v. Hagwood*, 292 Ga. App. 244, 246-247 (1) (663 SE2d 818) (2008), citing *Ponce de Leon Condos v. Di Girolamo*, 238 Ga. 188, 189-190 (1) (232 SE2d 62) (1977); see also *John H. Smith, Inc. v. Teveit,* 175 Ga. App. 565, 568 (1) (b) (333 SE2d 856) (1985) (failure of builder to install appropriate sediment control

21

devices despite recommendation from county authorized jury to find that defendant acted with conscious indifference to consequences and to award punitive damages.)

Oglethorpe and Smarr contend that they cannot be assessed punitive damages for actions which they undertook outside the limitation period. But in *Brooks v. Freeport Kaolin Co.*, 253 Ga. 678, 680 (III) (3) (324 SE2d 170) (1985), construing the same four-year statute of limitation for damages to realty applicable here, our Supreme Court held: "Insofar as the punitive-damage claim is based on *damages* to realty occurring within four years of suit, it is not barred by the statute of limitation." (Emphasis supplied.) And in its opinion in *Forrister*, as in *Brooks*, our Supreme Court characterized the permissible claims as claims for *damages* accruing within the statutory period, not claims based upon the source or origin of the nuisance causing the damages. See *Forrister*, supra, 289 Ga. at 336-337 (3). And we have held that evidence of a nuisance outside a limitation period is "relevant to the issue of bad faith and the award of attorney fees. [Cits.]" *City of Roswell v. Bolton*, 271 Ga. App. 1, 6 (3) (608 SE2d 659) (2004) (evidence more than six months prior to ante litem notice).

Oglethorpe and Smarr also argue that they complied with industry standards and therefore should not be liable for punitive damages, citing *Stone Man v. Green*, 263 Ga. 470, 472 (435 SE2d 205) (1993). But such compliance, while tending to

22

show a lack of evidence supporting the award of punitive damages, does not absolutely preclude such an award if the evidence shows "willful misconduct, malice, fraud, oppression, or that entire want of care which would raise the presumption of a conscious indifference to the consequences." (Citations and punctuation omitted.) *Barger v. Garden Way, Inc.*, 231 Ga. App. 723, 728 (7) (499 SE2d 737) (1998) (full concurrence in Division 7), *cert. denied*, 231 Ga. App. 907 (1998); see also *General Motors Corp. v. Moseley*, 213 Ga. App. 875, 885 (8) (a) (447 SE2d 302) (1994) ("[N]othing in *Stone Man* precludes an award of punitive damages where, notwithstanding the compliance with applicable safety regulations, there is other evidence showing culpable behavior.") Some evidence supported the jury's award, and we will not disturb it.

(e) Finally, Oglethorpe and Smarr challenge the sufficiency of the evidence as to attorney fees, arguing that evidence of a "bona fide controversy" prohibits their award under OCGA § 13-6-11. But the existence of a bona fide controversy negates the possibility of a statutory award only "[w]here bad faith is not at issue." *Lamb v. State Farm Mut. &c. Ins. Co.*, 240 Ga. App. 363, 365 (1) (522 SE2d 573) (1999).

> The issue of attorney fees under OCGA § 13-6-11 is a question for the
> factfinder and an award will be upheld if any evidence is presented to

23

support the award. OCGA § 13-6-11 provides for expenses of litigation where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. Bad faith warranting an award of attorney fees must have arisen out of the transaction on which the cause of action is predicated. Moreover, we have noted that there may be bad faith in carrying out the provisions of the contract sufficient to support the award. Finally, despite the existence of a bona fide controversy as to liability, a factfinder may find that defendant acted in the most atrocious bad faith in his dealing with the plaintiff.

(Citations and punctuation omitted.) *Burlington Air Express v. Georgia-Pacific Corp.*, 217 Ga. App. 312, 312-313 (457 SE2d 219) (1995). And bad faith may be found in a defendant's conduct if "it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive." (Citations and punctuation omitted.) *Fletcher v. C. W. Matthews Contracting Co.*, 322 Ga. App. 751, 756 (1) (d) (746 SE2d 230) (2013).

Here, as noted above with respect to punitive damages, some evidence of bad faith was produced. After assuring local residents that the plant would be "as unobtrusive as possible," Oglethorpe and Smarr, apparently motivated by self-interest, ignored noise issues that were common knowledge in the industry and failed to take timely action to ameliorate them. "Since the record contains some evidence

24

of bad faith, [the] argument regarding the existence of a bona fide controversy is irrelevant. [Cit.]" *Burlington*, supra, 217 Ga. App. at 314. We therefore affirm the judgment of the trial court denying JNOV or new trial to Oglethorpe and Smarr.

*Case Nos. A15A0376, A15A0377, and A15A0522*

3. In Case No. A15A0376, Paradise Lost, LLC ("Paradise Lost") appeals from the jury verdict in its favor in the trial of its individual claim for damages. This appeal presents a question of first impression in Georgia: may a limited liability company recover nuisance damages for "discomfort and annoyance" when it is a non-resident owner? We conclude that such damages are recoverable, and we therefore reverse the trial court's rulings on this point and remand for a new trial.

Paradise Lost is one of the landowners near the Sewell Creek Energy Facility. After the first-stage jury trial in which the jury found a change in the character of the nuisance since February 2003, the parties tried the nuisance claims of Paradise Lost to a second jury. Before trial, Oglethorpe and Smarr filed a motion in limine seeking to bar evidence of damages recoverable by Paradise Lost for "discomfort and annoyance" because it did not "occupy" the property. At the hearing on the motion, Oglethorpe and Smarr expanded their argument to include the contention that these damages were analogous to damages for intentional infliction of emotional distress

25

and therefore were not recoverable by a corporation. The trial court stated that it would allow evidence of any discomfort and annoyance on the part of members of the LLC, but that it was not inclined to allow such an award as an element of damages. After further briefing, the trial court granted the motion in limine orally and later in a brief written order, and declined to reconsider the ruling at trial. Paradise Lost enumerates as error this order in limine, as well as the refusal to give its Request to Charge No. 13 on the issue of damages or to include these damages in the special verdict form.

> A charge on a given subject is justified if there is even slight evidence from which a jury could infer a conclusion regarding that subject. A trial court may deny a specific request to charge if any portion of the request is inapt or incorrect, because a request to charge must be correct, legal, apt, even perfect, and precisely adjusted to some principle involved in the case. Nevertheless, a trial court must instruct a jury on the law as to every controlling, material, substantial and vital issue in the case. The failure to charge on a properly asserted and legally cognizable theory of recovery, whether requested or not, or attention be called to it or not, is harmful as a matter of law.

(Citations and punctuation omitted.) *Hendley v. Evans*, 319 Ga. App. 310, 311 (2) (734 SE2d 548) (2012). And, while the contents of a special verdict form are reviewed only for an abuse of discretion, *Sims v. Heath*, 258 Ga. App. 681, 687 (7)

26

(577 SE2d 789) (2002), the form must nevertheless be "adequately crafted to elicit a decision on the issues before the court." (Citations and punctuation omitted.) *Glisson v. Glisson*, 265 Ga. 239, 240 (4) (454 SE2d 508) (1995).The appropriate measure of damages is a question of law, and the trial court's decision in this regard is reviewed under the "plain legal error" standard. *McMillian v. McMillian*, 310 Ga. App. 735, 738 (713 SE2d 920) (2011).

(a) We first consider the nature of the "discomfort and annoyance" damages sought by Paradise Lost. In their appellate brief, Oglethorpe and Smarr characterize this element of damages as equivalent to a claim for emotional distress, and rely upon decisions from other jurisdictions holding that damages for emotional distress cannot be recovered by an entity other than a natural person. They further assert that "Georgia courts have equated discomfort and annoyance with emotional distress," citing *City of Warner Robins v. Holt*, 220 Ga. App. 794, 797 (3) (470 SE2d 238) (1996). This is not, however, a correct statement of Georgia law.

In *Holt*, the purported equation was made by the defendant, which, like Oglethorpe and Smarr, sought to characterize the disputed damages as "emotional distress." Id. This court recited instead the language of "discomfort, loss of peace of mind, unhappiness and annoyance" from *City of Columbus v. Myszka*, 246 Ga. 571,

27

573 (6) (272 SE2d 302) (1980).[3] Cases addressing this issue demonstrate that

"discomfort and annoyance" in the context of nuisance is not a species of emotional

distress, but a distinct element of nuisance damages, as found in our Code and those

cases which rely on the Restatement of Torts (2d).

Nuisance damages generally are provided for by OCGA § 41-1-4: "A private

nuisance may injure either a person or property, or both, and for that injury a right of

action accrues to the person who is injured or whose property is damaged." Georgia

courts have relied upon the Restatement (Second) of Torts § 929 for further

explanation of the elements of nuisance damages. *GE v. Lowe's Home Ctrs*, 279 Ga.

77, 78 (1) n.4 (608 SE2d 636) (2005) (specifically noting damages for loss of use of

land); *Klingshirn v. McNeal*, 239 Ga. App. 112, 117 (4) (520 SE2d 761) (1999)

(restoration costs).

Section 929 provides:

Harm to Land From Past Invasions[4]

---

[3]This language was taken from a plaintiff's petition in *Mayor &c. of Waynesboro v. Hargrove*, 111 Ga. App. 26 (2) (140 SE2d 286) (1965), cited in *Myszka*, supra.

[4]Restatement (Second) of Torts § 930 provides for the recovery of damages for future invasions. But, as our Supreme Court observed in *Forrister*, supra, "the plaintiffs here are limited to filing one cause of action for the recovery of past and

28

(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for

(a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,

(b) the loss of use of the land, and

(c) discomfort and annoyance to him as an occupant.

The comment to (1) (c) elaborates further:

Comment on Subsection (1), Clause (c):

e. *Discomfort and other bodily and mental harms.* Discomfort and annoyance to an occupant of the land and to the members of the household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests. He is also allowed to recover for his own serious sickness or other substantial bodily harm but is not allowed to recover for serious harm to other members of the household, except so far as he maintains an action as a spouse or parent, under the rules stated in §§ 693 and 703. The owner of land who is not an occupant is not entitled to recover for these harms except as they may have affected the rental value of his land.

---

future damages caused by a permanent nuisance." 289 Ga. at 335 (3).

Georgia decisions on damages are consistent with the Restatement. In *Swift v.*

*Broyles*, 115 Ga. 885, 887 (42 SE 277) (1902),[5] our Supreme Court held:

> Where there is such a wrongful interference with the comfortable
> enjoyment of property by a person in possession, no precise rule for
> ascertaining the damage can be given, as, in the very nature of things,
> the subject-matter affected is not susceptible of exact measurement;
> therefore the jury are left to say what, in their judgment, the plaintiff
> ought to have in money, and what the defendant ought to pay, in view
> of the discomfort or annoyance to which the plaintiff and his family
> have been subjected by the nuisance.

Id. at 887-888. The court further explained that, while the owner of the property is

entitled to damages for diminution in value, the occupier may recover for deprivation

of "unrestricted use and full enjoyment of the same. [Cits.]" Id. at 887. While

suggesting that any depreciation in the rental value of the property could be one

factor in determining such damages, id., the *Swift* court went on to say that this is not

necessarily the *only* measure of damages that can be applied, as rental values might

increase for other reasons, and the true measure is whether "his enjoyment of the

---

[5]*Swift* remains a leading case on damages for nuisance, cited as recently as
*Davis v. Overall*, 301 Ga. App. 4, 6 (1) (686 SE2d 839) (2009).

30

comforts of his home has been wrongfully interfered with to his legal injury." Id. at 889.

The Supreme Court ultimately reversed the trial court, holding that jury instructions allowing separate damages for depreciation of rental value, comfortable enjoyment, *and* physical discomfort and pain, were duplicative and allowed an award of double damages. Id. at 890-891. But this was not because damages for comfortable enjoyment were not recoverable, but because the trial court erroneously instructed the jury to make a separate award for each. See id. at 889-890. Instead, our Supreme Court held that all these elements were *factors* that the jury could take into account in a single award. Id.[6]

In *Jones v. Royster Guano Co.*, 6 Ga. App. 506 (65 SE 361) (1909), this court relied on *Swift* and further elaborated on "inconvenience and discomfort" damages. It reversed the trial court's refusal to allow both market value damages and

---

[6]In *Stanfield v. Waste Mgmt. &c. Inc.* 287 Ga. App. 810, 812 (1) (652 SE2d 815) (2007), this court cited *Swift* for the proposition that "[t]he law is equally clear that a plaintiff may not recover for both discomfort and diminution of value. [Cit.]" But this ignores *Swift's* holding that this is merely one of many measures of damages. Moreover, *Stanfield's* narrow reading of *Swift* appears to be dicta: the plaintiffs were appealing the grant of a directed verdict as to their trespass claim, not a nuisance, as the jury had found against them on the nuisance claim. We held that, since their only claim for damages had been decided against them, the grant of a directed verdict was harmless error. Id.

31

inconvenience and discomfort damages. 6 Ga. App. at 510-512. It noted that rental value is but one measure of damages to the owner's use of the property, and that when the owner also occupies the property he may recover "the reasonable value of the use." Id. at 512. *Jones* was relied upon recently in *City of Atlanta v. Murphy*, 194 Ga. App. 652 (1) (391 SE2d 474) (1990), which involved an abatable nuisance but distinguished damages to realty from discomfort and annoyance to the owner and his family, and held that the damages award was not a double recovery. *Segars v. Cleveland*, 255 Ga. App. 293 (564 SE2d 874) (2002), a permanent nuisance case, in turn relies upon *Murphy* to hold that "[d]amages for discomfort and annoyance caused to the owner . . . are separate and distinct from damage to the value of the realty. An award of damages for discomfort and annoyance is for the enlightened conscience of the jury and should not be disturbed if there is any evidence to support it." (Citations omitted.) Id. at 296 (1).

(b) We must next consider whether discomfort and annoyance as an element of nuisance damages may be asserted by a limited liability company. The United States Supreme Court has held that the members of a religious corporation may have such a claim. In *Baltimore & Potomac R. v. Fifth Baptist Church*, 108 U. S. 317, 329-330 (2 SCt 719, 27 LE 739) (1883), the church, a religious corporation created under

32

a general incorporation act[7], sued a railroad company after it built an engine yard and machine shop on property next to the existing church building. The Supreme Court acknowledged that nuisance damages for "annoyance and discomfort" were recoverable, and further noted:

> The right of the plaintiff to recover for the annoyance and discomfort to its members in the use of its property, and the liability of the defendant to respond in damages for causing them, are not affected by their corporate character. Private corporations are but associations of individuals united for some common purpose, and permitted by the law to use a common name, and to change its members without a dissolution of the association. Whatever interferes with the comfortable use of their property, for the purposes of their formation, is as much the subject of complaint as though the members were united by some other than a corporate tie. Here the plaintiff, the Fifth Baptist Church, was incorporated that it might hold and use an edifice, erected by it, as a place of public worship for its members and those of similar faith meeting with them. Whatever prevents the comfortable use of the property for that purpose by the members of the corporation, or those who, by its permission, unite with them in the church, is a disturbance and annoyance, as much so as if access by them to the church was impeded and rendered inconvenient and difficult. The purpose of the organization is thus thwarted. It is sufficient to maintain the action to

---

[7]In Georgia today, such a religious corporation would be considered a nonprofit corporation under OCGA § 14-3-101. See OCGA § 14-5-40.

33

> show that the building of the plaintiff was thus rendered less valuable for the purposes to which it was devoted.

Id. at 329-330. This decision has been relied on frequently in Georgia: in our Supreme Court as recently as 1938, *Warren Co. v. Dickson*, 185 Ga. 481, 483 (2) (195 SE 568) (1938), and in the Court of Appeals as recently as 1972. *Thomas v. Campbell*, 126 Ga. App. 675, 678 (191 SE2d 619) (1972) (Hall, P. J., dissenting). *Swift*, supra, relies on *Fifth Baptist Church* with reference to "annoyance" damages, as does *Jones*, supra. *City Council of Augusta v. Boyd*, 70 Ga. App. 686, 689-690 (29 SE2d 437) (1944), also relies on *Fifth Baptist Church* to allow a householder to recover for the annoyance and discomfort of his family members, quoting from that Supreme Court decision at some length:

> The plaintiff was entitled to recover because of the inconvenience and discomfort caused to the congregation assembled, thus necessarily tending to destroy the use of the building for the purposes for which it was erected and dedicated. The property might not be depreciated in its salable or market value . . . . But, as the court below very properly said to the jury, the congregation had the same right to the comfortable enjoyment of its house for church purposes that a private gentleman has to the comfortable enjoyment of his own house, and it is the discomfort and annoyance in its use for those purposes which is the primary consideration in allowing damages.

34

70 Ga. App. at 689, citing 108 U. S. at 335.[8] We therefore conclude that a limited liability company may have a cause of action for "discomfort and annoyance" affecting the use of its property for the purposes intended by its members and those they permit to join them.

(c) Finally, we consider the question of whether Paradise Lost is an "occupant" of its property for the purpose of damages for nuisance. Oglethorpe and Smarr contended below – although they appear to have abandoned the argument in this court[9] – that "occupant" is the equivalent of "resident," and that because Paradise Lost does not reside upon the property, it cannot recover for damages for "discomfort and annoyance."

---

[8]Oglethorpe and Smarr point to the statement in *Northern Pac. R. Co. v. Whalen*, 149 U. S. 157, 163 (37 LE 686, 13 SCt 822) (1893), that "[a]s a corporation cannot be said to have life or health or senses, the only ground on which it can obtain either damages or an injunction . . . is injury to its property." But in that case, the Supreme Court held that a railroad had no cause of action in private nuisance for an injunction against a tavern owner who sold intoxicating liquors to its workers and incapacitated them for work. Id. at 162. The language with respect to damages is therefore dicta.

[9]In their brief on appeal, Oglethorpe and Smarr acknowledge that their "original motion focused on Appellant's status as a non-resident," but they do not address this issue. This appears to be at least a tacit acknowledgment that appellees' original contention lacked merit, but we nevertheless address the question.

But Georgia law is clear that residence is not necessary for occupancy. In *McIntyre v. Scarbrough*, 266 Ga. 824 (471 SE2d 199) (1996), our Supreme Court rejected the interpretation proposed by Oglethorpe and Smarr below:

> The trial court found that the warranty deed required [appellant] to occupy the tract as a personal residence as a condition of her life estate, concluding that "occupy" meant to "to dwell in" according to Webster's New Universal Unabridged Dictionary. Relying on the affidavits of record, the court found as a matter of law that [appellant] failed to occupy the property. However, the court's definition of occupancy was too narrow.
>
> "Occupy" is more expansively defined in Black's Law Dictionary, p. 1231 (Rev. 4th ed. 1968) as "to hold possession of; to hold or keep for use; to possess." Because one may occupy a residence by holding it or keeping it for use, the court erred in imposing a requirement that permanent physical presence was necessary to fulfill the occupancy requirement of the warranty deed.

Id. at 825 (1).

In the context of prescription, "[a]ctual possession of lands may be evidenced by enclosure, cultivation, or any use and occupation of the lands" which is notorious and exclusive. OCGA § 44-5-165. See also *Mathews v. Cloud*, 294 Ga 415, 418 (2) (754 SE2d 70) (2014) (repair of pond and dam sufficient to authorize jury to find

36

possession even though land not enclosed or cultivated); *Chamblee v. Johnson*, 200 Ga. 838, 842 (1) (38 SE2d 721) (1946) (use of property occasionally for camping purposes and summer home, and building retaining walls and cabin thereon, sufficient to authorize jury to find adverse possession). This definition comports with Comment (a) to Restatement (Second) of Torts § 157, cited by appellants: "By 'occupancy' is meant such acts done upon the land as manifest a claim of exclusive control of the land, and indicate to the public that he who has done them has appropriated it. Thus, the erection of maintenance of a substantial enclosure around a tract of land usually constitutes an occupancy of the entire tract." And in *Fifth Baptist Church*, supra, church members and their guests did not reside at the property, but only used the property for church and Sunday school purposes. This did not affect the corporation's claim for interference with "the comfortable use of the property for that purpose by the members of the corporation." 108 U. S. at 330.

We therefore conclude that the trial court erred in removing the issue of damages for "discomfort and annoyance" from consideration by the jury. Whether the property was not used as a residence, whether individual members and others who used the property were only occasionally there, and whether the evidence failed to show annoyance or discomfort during the limitation period, are all questions to be

37

considered by the jury in deciding the existence and, if so, the amount of damages, not whether a *claim* for such damages may be submitted to the jury.[10] We therefore must reverse and remand for a new trial on the issue of damages.

As a result of our reversal in Case No. A15A0376, Oglethorpe and Smarr's cross-appeals are dismissed as moot.

*Judgment affirmed in Case Nos. A15A0374 and A15A0375. Judgment reversed and case remanded in Case No. A15A0376. Appeals in Case Nos. A15A0377 and A15A0522 dismissed as moot. Doyle, C. J. and Phipps, P. J., concur.*

---

[10]We note that, on retrial, the jury should be instructed as to the specific elements of nuisance damages and more specifically those of "discomfort and annoyance" or "loss of enjoyment" damages, so as to avoid the risk of double recovery as noted in *Swift*, supra.