**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 18, 2020**

# In the Court of Appeals of Georgia

A19A1982. JONES et al. v. BEBEE.

DILLARD, Presiding Judge.

Paul and Nicole Jones appeal from the trial court's denial of their motion for partial summary judgment and motion for directed verdict in this action by Katrina Bebee to recover for injuries that she received as a result of bites from the Joneses' dog. The Joneses argue that the trial court erred in denying their motions for summary judgment and directed verdict when there was no evidence they were willful or wanton or that their conduct rose to an entire want of care so as to be indifferent to the consequences.[1] For the reasons set forth *infra*, we affirm.

---

[1] Although the Joneses argue separately that the trial court erred in denying their motions for summary judgment and directed verdict on the question of punitive damages, we only address the latter argument because the judgment on the motion for summary judgment was rendered moot by the verdict and entry of judgment at trial. *See Moore v. Moore*, 281 Ga. 81, 85 (6) (635 SE2d 107) (2006) ("The denial of [a]

Viewed in the light most favorable to the jury's verdict,[2] the record shows that, on the day in question, Bebee was working as a mail carrier for the United States Postal Service and needed to deliver packages to the Joneses' front door. As Bebee approached, the Joneses' youngest son emerged from the front door and met her to accept the packages.

After briefly speaking with the youngest son, Bebee returned to her truck, but before she could enter it, she heard someone scream "no" and saw that a dog was near her leg. The dog—a 57-pound boxer named Roy Jones, Jr.—bit Bebee's leg and, although she was able to kick him off, he charged at her again and bit her on the arm she raised to defend herself. The dog would not release Bebee's arm, and she struggled to pry its jaws open with her free hand while the Joneses' eldest son appeared and tried to pull the dog off from behind. When the dog finally released her

motion for summary judgment is enumerated as error. However, after verdict and judgment, it is too late to review a judgment denying a summary judgment, for that judgment becomes moot when the court reviews the evidence upon the trial of the case." (punctuation omitted)); *Ameris Bank v. Alliance Inv. & Mgmt. C., LLC*, 321 Ga. App. 228, 230 (1) (739 SE2d 481) (2013) (same).

[2] *See, e.g.*, *Hanham v. Access Mgmt. Grp. L.P.*, 305 Ga. 414, 418 (3) (825 SE2d 217) (2019) ("The denial of a directed verdict will be upheld on appeal if, construing the evidence in the light most favorable to the verdict, there is any evidence to support the verdict." (punctuation omitted)); *Robinson v. Williams*, 280 Ga. 877, 878 (2) (635 SE2d 120) (2006) (same).

arm, Bebee immediately jumped into her truck and saw that the dog was charging toward her again as she frantically attempted to roll up the window. The dog eventually followed one of the sons back into the house.

Once safely in the truck, Bebee realized that she had no feeling in her arm and it was covered in blood, at which point she called 911 and her supervisor. At this time, Bebee was still unaware that she had also been bitten on her leg. But when the paramedic arrived on the scene, he noticed this injury and advised her of it. And when a glove was removed from one of Bebee's hands, it was obvious that she had sustained a bite there as well. Bebee was then treated for her injuries and also received a series of rabies shots because it was unknown whether the dog had been vaccinated. As a result of her injuries, Bebee required physical therapy due to difficulties that she experienced with moving her arm and leg even after swelling subsided. Additionally, Bebee underwent a procedure to reduce the visibility of scarring to her body; but the pain from the procedure was so great that she could not continue the treatment. Accordingly, Bebee was left with clearly visible scars from the bites. She also underwent counseling for quite some time due to nightmares after the attack and a fear of dogs.

An animal-control officer was dispatched to the Joneses' house while Bebee was still being treated by paramedics, and he explained to the Joneses that the dog would need to be quarantined and confined for ten days. He also issued citations to the Joneses for nuisance, having a dog at large, and failing to register their dog with the county (which allows for easier verification that a dog has received its rabies vaccination).

Paul and Nicole Jones were not home at the time of the incident, but their sons were there. It is undisputed that the dog was not muzzled, locked in a crate, or secured in a bedroom at the time Paul and Nicole left the house. Indeed, prior to Bebee's arrival, the youngest son—who was 11—had been upstairs in a bonus room with the dog while his older brother—who was 19—did chores in the backyard. When Bebee approached the house, the youngest son called his mother for permission to open the door, and the dog ran back and forth between a window in the dining room and the front door. The youngest son was told that he could answer the door so as long as the dog was placed in the designated area. As a result, he put the dog in a space comprised of two baby gates on two sides of a hallway before opening the door, stepped out to greet Bebee, and closed the door behind him. But when the youngest son reentered the house with three packages in his hands, the dog was no longer

confined between the baby gates, and it escaped through the boy's legs and darted out the front door, despite his efforts to stop it. At the time, the Joneses' youngest son was wearing a knee brace for an injury, and the brace restricted his ability to run or move quickly. The eldest son came to assist when his little brother called for him after the dog failed to respond to commands, at which point the eldest son was able to get the dog back into the house.

Bebee filed suit against the Joneses in January 2017. In March 2018, the Joneses moved for but were denied partial summary judgment on the issue of punitive damages. At trial, the Joneses argued that they were entitled to a directed verdict on this question, but the trial court declined to take the question of punitive damages away from the jury. Ultimately, the jury returned a verdict in favor of Bebee and awarded $75,000 in damages. The jury additionally concluded that punitive damages were warranted in the amount of $50,000. The trial court thereafter entered a final judgment in favor of Bebee with a total of $125,000 in damages. This appeal by the Joneses follows, in which they challenge the issue of punitive damages but not liability.

We review the denial of a motion for directed verdict to determine if any evidence supports the verdict.[3] Indeed, a motion for directed verdict should not be granted when there are even "slight material issues of fact, because the trial court is substituting its judgment for the jury's; only when there is an absence of evidence or when no evidence supports an essential element of the case should a directed verdict be granted, because the trial judge takes the determination of the facts from the jury."[4] And a directed verdict is proper only when there are no conflicts in the evidence as to any material issue, and the evidence—with all reasonable deductions—demands a particular verdict.[5]

---

[3] *See Whitaker Farms, LLC v. Fitzgerald Fruit Farms, LLC*, 347 Ga. App. 381, 385 (1) (819 SE2d 666) (2018) ("The standard of appellate review of a trial court's denial of a motion for a directed verdict or motion for judgment notwithstanding the verdict is the any evidence test." (punctuation omitted)); *see also Patterson-Fowlkes v. Chancey*, 291 Ga. 601, 602 (732 SE2d 252) (2012).

[4] *Canton Plaza, Inc. v. Regions Bank, Inc.*, 315 Ga. App. 303, 303 (732 SE2d 449) (2012) (punctuation omitted); *accord Miller v. Lynch*, 351 Ga. App. 361, 364 (1) (830 SE2d 749) (2019); *Teklewold v. Taylor*, 271 Ga. App. 664, 665 (610 SE2d 617) (2005).

[5] *See Odom v. Hughes*, 293 Ga. 447, 453 (3) (748 SE2d 839) (2013) ("A directed verdict is authorized only when there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict." (punctuation omitted)); *Canton Plaza*, 315 Ga. App. at 303-04 (same); *Miller*, 351 Ga. App. at 361 (4) (same); *Teklewold*, 271 Ga. App. at 665 (same).

In this case, the Joneses moved for a directed verdict on the question of punitive damages, which the trial court denied. Punitive damages may be awarded only in such tort actions in which it is "proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."[6] And in this sense, conscious indifference to consequences means "an intentional disregard of the rights of another, knowingly or wilfully."[7] Indeed, something more than "the mere commission of a tort is always required for punitive damages"—*i.e.*, "circumstances of aggravation or outrage."[8]

---

[6] OCGA § 51-12-5.1 (b); *accord MCD Blackshear, LLC v. Littell*, 273 Ga. 169, 173 (4) (537 SE2d 356) (2000); *Weller v. Blake*, 315 Ga. App. 214, 219 (3) (726 SE2d 698) (2012).

[7] *COMCAST Corp. v. Warren*, 286 Ga. App. 835, 839 (2) (650 SE2d 307) (2007); *accord Oglethorpe Power Corp. v. Estate of Forrester*, 332 Ga. App. 693, 702 (2) (d) (774 SE2d 755) (2015); *Crosby v. Kendall*, 247 Ga. App. 843, 848 (2) (b) (545 SE2d 385) (2001).

[8] *Wardlaw v. Ivey*, 297 Ga. App. 240, 242 (1) (676 SE2d 858) (2009) (punctuation omitted); *accord Lindsey v. Clinch Cty. Glass, Inc.*, 312 Ga. App. 534, 535 (718 SE2d 806) (2011); *see Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 121-22 (4) (365 SE2d 827) (1988) ("Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton. There is general agreement that, because

Finally, when we review the denial of a directed verdict on the question of punitive damages, we must determine, as a matter of law, "whether the evidence was sufficient under the clear and convincing standard," which is "an intermediate standard of proof, requiring a higher minimum level of proof than the preponderance of the evidence standard, but less than that required for proof beyond a reasonable doubt."[9]

Here, in addition to the testimony regarding Bebee's incident with the Joneses' dog, the jury heard testimony from a FedEx driver who—while making a delivery to a neighboring house a little more than two years before the incident in question—was approached by the dog while it was outside wearing a shock-collar for an invisible electric fence, which was the Joneses' method at that time for containing the dog.[10]

---

it lacks this element, mere negligence is not enough, even though it is so extreme in degree as to be characterized as 'gross,' a term of ill-defined content, which occasionally, in a few jurisdictions, has been stretched to include the element of conscious indifference to consequences, and so to justify punitive damages. Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort.").

[9] *See Ga. Clinic, P.C. v. Stout*, 323 Ga. App. 487, 491 (1) (747 SE2d 83) (2013) (punctuation & citation omitted); *accord Clarke v. Cotton*, 263 Ga. 861, 861 (440 SE2d 165) (1994).

[10] Nicole Jones testified at trial that the family stopped using the invisible electric-fence system because it established rules to no longer allow the dog outside of the home off of a leash. But Paul Jones testified that, at the time Bebee was bitten, the dog still wore the invisible-fence collar despite the family's new leash rule.

Nevertheless, the dog proceeded into the neighboring driveway, charged the FedEx driver, and made contact with the driver's shin. The dog then retreated to the Joneses' house when repeatedly called by someone at the residence. Once back in his truck, the FedEx driver realized that he was bleeding on his leg from a dog bite, for which he obtained medical treatment. Before he left, a woman who appeared to be Nicole Jones approached the delivery truck and requested to take a picture of the man's bite, which he declined. The Joneses never attempted to contact the FedEx driver to inquire about the injury he suffered from the dog bite. Shortly thereafter, they received a warning from animal control as a result of this incident.

According to Nicole Jones, the FedEx driver was the first person the dog ever bit, but the family did not obtain training for the dog after this incident (other than to retrain him on the parameters of the invisible fence). But they did purchase a "beware of dog" sign that alternated between sitting on the front porch or placed in a front-facing window of the house, depending on the weather. And while the Joneses were unable to build a physical fence around the home because it was leased, they did increase the intensity of the shock for the invisible fence.

Nevertheless, after the incident with the FedEx driver, it is undisputed that the dog was involved in a second incident while the family continued to use the invisible-

fence system.[11] A former neighbor of the Joneses testified that following a big snow storm approximately two years before the incident in question, she saw a figure running toward her as she was walking along her side of the street to check the condition of the major road in the neighborhood. Then, suddenly, she was being bit by the Joneses' dog. She eventually managed to get the dog off of her, and the Jones children—who had been sledding across the street while the dog was outside—yelled over to the dog and asked if the neighbor was all right. The neighbor, crying and upset, told the children to get their mother, at which point they ran to their front door with the dog behind them, and entered the house after their mother opened the door. But the Joneses never came out to check on the neighbor, and they never followed up to check on her or determine the extent of the injuries she suffered.

The dog had bitten the neighbor's hand, leaving puncture wounds and drawing blood, for which she obtained medical treatment. The neighbor eventually saw the Joneses at "dog bite court," where they received citations related to the incident that identified Roy Jones, Jr. as a "vicious dog." Following the incident, the Joneses enrolled the dog in an obedience school that used a shock collar, instituted a family

_____

[11] Paul Jones testified that they were aware that, after a dog crosses the invisible-fence boundary, the fence will potentially be ineffective to contain the dog in the future.

policy of no longer allowing the dog out of the house off of a leash, and created the confined space with baby gates in which to place the dog when necessary.

In addition to these prior incidents of biting, there was also undisputed evidence that the dog was muzzled when at its veterinarian's office due to aggression prior to the incident with Bebee and, on another occasion, actually bit an employee during an ear cleaning. Even so, a veterinary technician testified that this behavior is not uncommon for animals experiencing fear and anxiety during procedures. But it is also undisputed that the Joneses never consulted with their veterinarian's office about the biting incidents or requested assistance with curbing the dog's aggression (*e.g.*, seek a referral for a veterinary behaviorist).

Finally, Bebee testified to having delivered many packages to the Joneses' home on prior occasions and never noticing the "beware of dog" sign.[12] But since the incident with Bebee, the Joneses no longer receive mail or packages at their home, instead having everything delivered to a post office box. Additionally, they no longer use their front door, and they lock the dog in an extra room when visitors come to the home. Nevertheless, both Paul and Nicole Jones testified at trial that there is still no

---

[12] The neighbor who was also bitten by Roy Jones, Jr. also testified that she never saw this sign up on the Joneses' property.

fencing around the house or gating on the front porch of their home, and thus nothing to prevent the dog from biting someone else if it somehow escapes from the house.

Considering all of the foregoing, there was evidence that the Joneses' dog had on two prior occasions viciously attacked individuals outside of the home without warning or provocation; and one of these attacks occurred even though the dog was outside with the Joneses' children. The evidence also showed that the dog was known to have an aggressive temperament. But even after the two earlier attacks, the Joneses failed to directly and effectively address the dog's aggression issues (even though they did sign the dog up for a few weeks of obedience training). They also no longer allowed the dog to roam outside, used a "beware of dog" sign, and created a confined area within the home comprised of baby gates. Even so, there was evidence that, on the day in question, Paul and Nicole Jones were not at home, the Joneses' 11-year-old son was the only one in the house watching the dog and his mobility was hampered by a knee brace, the dog was excited by Bebee's approach to the house, and the son phoned his mother for direction on what to do after Bebee arrived, at which point Nicole directed her son to answer the door after placing the 57-pound "vicious" dog behind baby gates (rather than a crate or a closed room). Thus, while it is true that there was some evidence of remedial steps taken by the Joneses after the first two

12

attacks by their dog, it was for the jury to determine "whether the actions [the Joneses] took on the day of the incident showed the requisite want of care or conscious indifference to the consequences that would warrant punitive damages."[13] Accordingly, the trial court did not err in denying the motion for directed verdict.

*Judgment affirmed. Gobeil and Hodges, JJ., concur.*

---

[13] *Weinstein v. Holmes*, 344 Ga. App. 391, 396 (810 SE2d 320) (2018); *see id.* ("[Defendant's] own testimony of her knowledge that [the dog] was full of energy and liked to play with other dogs, coupled with the neighbors' affidavits reflecting a prior similar instance of aggressive behavior that could have resulted in an injury creates a question for the jury as to punitive damages[.]"); *Parsons v. Ponder*, 161 Ga. App. 723, 724 (2) (288 SE2d 751) (1982) ("The record discloses that on more than one occasion prior to the incident in question 'Bite Reports' and orders to quarantine appellant's dog were issued by the County Health Department. There was testimony from appellant's neighbors that the dog had attacked and bitten a child and that appellant had been asked to keep the dog locked up. Despite appellant's knowledge of the dog's propensity to bite human beings, the dog was allowed to run at large. The evidence in this case was sufficient to support the jury's determination that aggravating circumstances existed and that exemplary damages were authorized."). *But see Powell v. Ferreira*, 198 Ga. App. 465, 467 (402 SE2d 85) (1991) ("[T]he evidence here shows the defendants exercised at least some degree of care to confine the dog in their house, and keep it closed off in another room when they knew a non-family member was present. Though the defendants' lack of strict control over access to the house by non-family members may have amounted to negligence, even gross negligence, it is not evidence of wilful misconduct or an entire want of care necessary to create a genuine issue with respect to punitive damages.").