**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 26, 2018**

# In the Court of Appeals of Georgia

A18A1420, A18A1421. WHITAKER FARMS, LLC v. FITZGERALD FRUIT FARMS, LLC; and vice versa.

BROWN, Judge.

Whitaker Farms, LLC appeals following a jury verdict in favor of Fitzgerald Fruit Farms, LLC on Fitzgerald Farms' complaint seeking damages for trespass after Whitaker Farms' property manager locked the gates to the peach orchard where Fitzgerald Farms was harvesting peaches. In Case No. A18A1420, Whitaker Farms contends that the trial court erred in denying its motion for a directed verdict and motion for judgment notwithstanding the verdict on the trespass claim, and awarding Fitzgerald Farms attorney fees. Fitzgerald Farms cross-appeals in Case No. A18A1421, arguing that the trial court erred by not allowing the jury to consider an award of punitive damages. For reasons that follow, we affirm the trial court's denial

of Whitaker Farms' motion for a directed verdict and motion for judgment notwithstanding the verdict, but reverse the trial court's refusal to allow the jury to consider an award of punitive damages.

Construed in favor of the verdict, *Hagan v. Keyes*, 329 Ga. App. 178 (764 SE2d 423) (2014), the evidence shows that Sean Lennon, the owner of Fitzgerald Farms, began working for Carroll Farms in high school. Carroll Farms was a peach and cattle farm in Meriwether County owned by Lennon's math teacher, Elizabeth "Kay" Carroll Barnes, and her son, Walter "Hynes" Barnes; Hynes ran the business and managed the family's farm properties. Throughout high school and college, Lennon worked at Carroll Farms during the summer months. After obtaining a master's degree in 2003, Lennon began working full-time farming peaches at Carroll Farms. Sometime around 2006, Hynes and Kay agreed to allow Lennon to grow Baby Gold peaches on a 20-acre tract of their farm after he was approached by a Canadian canning company looking for people to grow Baby Gold peaches for use in baby food. Lennon testified that the parties had an "oral handshake deal" for him to lease the 20-acre tract for the economic life of the peach trees (10-15 years), and that Lennon and Kay later signed a written lease agreement so that Lennon could obtain

2

crop insurance.[1] Lennon maintained his own packing facility, including a commercial packing shed and a forced air cooler, which cools the peaches rapidly because "they can't tolerate [the summer] heat for that long"; Fitzgerald Farms has the only forced air cooler in Meriwether County.

Unbeknownst to Lennon, in October 2015, Hynes and Curtis Whitaker, the owner of Whitaker Farms, agreed that Whitaker Farms would buy 290 acres of Carroll Farms, including the 20-acre orchard on which Fitzgerald Farms had been farming peaches for over a decade and a separate 95-acre tract, as well as the Carroll Farms "business."[2] At closing, both Hynes and Kay signed an Owner's Affidavit swearing that the property was "subject to no leases, tenancies, adverse possession, occupancy rights, licenses, or similar claims by third parties." Hynes never advised

---

[1] A copy of the written lease could not be found, but evidence was presented that Lennon maintained crop insurance on the Baby Gold orchard for at least 2013-2016, and both Lennon and Hynes confirmed that Lennon could not have obtained crop insurance without a written lease. And, acreage reports for the years 2009-2016, produced by the United States Department of Agriculture, Farm Service Agency, list Lennon as "other tenant" of the farm/tract of land on which he grew the Baby Golds.

[2] Hynes testified that he and Whitaker have been friends for approximately 15 years. In late 2014, the bank foreclosed on another piece of property owned by the Barnes family. Hynes and Whitaker discussed that Whitaker would bid on the property and that "'at some point Curtis Whitaker would allow [Hynes] to buy it back.'" Whitaker did not win the bid. Hynes confirmed that Lennon or Fitzgerald Farms won the bid.

Whitaker that Lennon "had planted a 20-acre peach orchard [on the property] and had farmed it every year for a decade" because he "didn't feel like it was necessary. The land was sold, and there was no lease."[3] After the purchase, Hynes agreed to manage the property for Whitaker Farms and testified that he works as a contractor.

Several months after the sale, Lennon and his workers began to prepare for the 2016 harvest, which included regularly spraying the Baby Gold peach trees in the "Jones Chapel Baby Gold Tract" from December 2015 through July 2016. Lennon

---

[3] Hynes did not tell Whitaker about Lennon's Baby Gold orchard until April 2016, when Hynes saw that Fitzgerald Farms had "pushed up" 270 experimental trees that Lennon had planted on the property sometime after 2006. Lennon explained that after he planted the Baby Gold peach trees in 2006, he planted a test block of experimental trees which he never harvested because the "trees never cropped." When those trees were nine-years old, Lennon decided to "push[] them up." Lennon explained that it is important to "push up" non-producing trees because "as part of being a good steward to the land and just being a good farmer, you just don't want to leave things growing up there . . . they'll just rot" and become infested with insects which will then invade a neighboring vigorous orchard. When Whitaker found out from Hynes that Lennon had "pushed up" the experimental trees, he reported the incident to the Sheriff, complaining that Lennon or his crew damaged "200, 220 peach trees" on his property. A deputy advised Whitaker that the issue was a civil matter because Lennon and Hynes "entered into an agreement and . . . owned these trees together from my understanding at that time . . . they both had ownership of the trees. . . . [A]s far as damaging the trees, . . . it's part of Mr. Lennon's property." When the deputy referred Whitaker to the magistrate court, he recalled that Whitaker became "somewhat abrasive" because Lennon was not going to be arrested immediately.

testified that he never observed Whitaker in the orchard during that time, but that Hynes drove by the packing shed at least a dozen times every day, never stopping to say a word. On August 3, 2016, "the day before harvest," Lennon and his workers moved their equipment to the orchard so they would be ready to begin picking the following morning. The following morning, a crew of approximately 25-28 workers gathered at the orchard to begin harvesting the peaches. Levi Jackson, a Fitzgerald Farms employee, testified that while he was working that morning, he observed Hynes driving "down the road that cuts through the orchard." Jackson left the orchard with the first load of peaches, dropped them at Fitzgerald Farms' packing shed and then returned to the orchard to pick up a second load; at that time, all of the gates to the orchard were unlocked. When Jackson tried to leave the property with the second load, he found that all three gates to the orchard had been locked and he observed Hynes driving away from one of the gates. According to Jackson, "our lock was took off of [the gate], and it had a combination lock on it." For his part, Hynes testified that he never saw anyone picking peaches on August 4, 2016, and that he changed the lock to a combination lock because "[e]very lock on the farm ha[d] been changed to a combination lock."

When Jackson realized he and the workers were locked in the orchard, he called Lennon. Lennon immediately texted Hynes asking if he could unlock the gate and Hynes texted back: "'You will need to talk to Curtis Whitaker that now owns it. I will send you his number.'" Lennon left a voice mail for Whitaker[4] and also called the sheriff's office. The record reflects that Hynes immediately called Whitaker to advise that he had given Whitaker's phone number to Lennon and that Lennon "would like to get *in* the gate at the blackberries." Whitaker testified that he and Hynes spoke for ten minutes about Hynes "going to the market to buy more produce" and that Hynes mentioned something about the locked gate, "but [Whitaker] didn't pay any attention to it." According to Hynes, Whitaker said "he would get with [Lennon]." Whitaker acknowledged that he never called Lennon back and "never instructed Mr. Lennon to go complete the harvest on my property." Whitaker testified that he did not "think [Lennon] had any right to be out there picking peaches" on

---

[4] Whitaker testified at trial that he could not recall whether he heard Lennon's voice mail late that night or the following morning, but stated that he knew who Lennon was "because he was the guy that I understood that worked for Hynes as an employee that bulldozed our experimental trees." Whitaker, in his deposition testimony, which was read to the jury, testified that he did not return Lennon's call because he "really didn't even know who [Lennon] was. I mean, I don't even know who he is. Plus at this point in time I don't think – you know, I don't think it would be good for he and I to have a conversation." Whitaker clarified "this point in time" as being the date of his deposition as well as August 4, 2016.

Whitaker Farms property and when asked why he did not return Lennon's call, he stated "[w]ell, . . . I was going from one place, I think, to another, and I don't know that I would pick up the phone and call someone that had bulldozed my peaches. I thought that issue was behind me, and it had been three or four months."

After receiving permission from a superior court judge, the sheriff cut the lock. The next morning, Hynes returned to the property and re-locked the gates; both Hynes and Whitaker acknowledged that they spoke at least eight times that day, but could not recall the details of any of those calls though Whitaker testified, "[w]hen someone steals your peaches you, you know, are going to have a lot of conversation about that."

On August 5, 2016, Fitzgerald Farms filed a verified complaint for temporary restraining order against Hynes asking the court for authorization to complete the peach harvest and advising that the matter required immediate attention because any delay could result in the crop being ruined. Fitzgerald Farms' attorney emailed a copy of the complaint to Hynes on the same day and Hynes immediately forwarded that email to Whitaker. On August 9, 2016, Whitaker executed an application for criminal arrest warrant seeking to keep Lennon off the property. Three days later, a judge granted Fitzgerald Farms' motion for temporary restraining order and Hynes unlocked

7

the gates at the direction of Whitaker's attorney, Virgil Brown. By that time, the peaches were "overripe," "decay[ed]" and damaged by insects; the crop was ruined.

Fitzgerald Farms' verified complaint included a claim for trespass, and was later amended to include claims for unjust enrichment and attorney fees under OCGA § 13-6-11, and sought "actual damages" in the amount of not less than $90,000 and punitive damages. On September 6, 2016, Whitaker Farms moved to intervene in the action and filed an answer and counterclaim. The court granted the motion to intervene and, shortly thereafter, Hynes was dismissed without prejudice by consent of the parties, and Fitzgerald Farms withdrew its claim for unjust enrichment. The trial court ruled that Fitzgerald Farms could not seek punitive damages, reasoning that Whitaker

> didn't lock the workers in the field. . . . [W]hile it may very well be that Mr. Whitaker ratified [Hynes'] conduct, that ratification in my mind certainly wouldn't allow the jury to extrapolate from that a claim for punitive damages. If [Hynes] was in the case, I would let a claim against him for punitive damages go to the jury, but not this.

Following a trial on the claims asserted, a jury found in favor of Fitzgerald Farms in the amount of $150,000 in actual damages, found against Whitaker Farms on its counterclaim, and concluded that Fitzgerald Farms was entitled to attorney fees.

In the second phase of the bifurcated trial on the issue of attorney fees, counsel for Fitzgerald Farms testified that his client had incurred attorney fees of $244,159, plus expenses of $2,174.63, and an estimated $150,000 for trial, but that Fitzgerald Farms was seeking to recover $272,929.20. The jury awarded Fitzgerald Farms $400,000 in attorney fees pursuant to OCGA § 13-6-11.[5] After the trial court entered judgment in favor of Fitzgerald Farms in the amount of $550,000, Whitaker Farms filed a motion for judgment notwithstanding the verdict and motion for new trial. Following a hearing, the trial court denied Whitaker Farms' motions, but reduced the attorney fees award to $272,000.[6]

*Case No. A18A1420*

---

[5] During the bifurcated portion of the trial on attorney fees, Lennon testified that in an effort to settle the matter, he met with Whitaker in January 2017. Whitaker refused to settle, stating "'I'm going to make an example of you. I'm going to make a point. . . . I thrive off this type of litigation. . . . I have been in this type of litigation before and that individual had to file bankruptcy.'" Whitaker also indicated that "he was litigating with a blank check and for [Lennon] to keep that in mind."

[6] The trial court granted Whitaker Farms' motion for new trial as to attorney fees only, conditioned on Fitzgerald Farms' refusal to accept a reduced judgment in the amount of $422,000 (general damages of $150,000 and reduced attorney fees of $272,000). Fitzgerald Farms filed a notice of acceptance of reduced OCGA § 13-6-11 attorney fees award and modified judgment. The notice of acceptance states that "the jury award of $150,000 in damages remains unchanged." The trial court subsequently entered a modified judgment in the amount of $422,000, which also noted that the original $150,000 damage award remained unchanged.

9

1. Whitaker Farms contends that the trial court erred in denying its motion for a directed verdict and motion for judgment notwithstanding the verdict on Fitzgerald Farms' claim for trespass because there was no evidence presented at trial that Whitaker Farms' ratified Hynes' "unauthorized wrong." In support of this claim, Whitaker Farms argues that Fitzgerald Farms failed to provide evidence that Whitaker Farms received a certain, direct tangible and valuable benefit from the unauthorized act. This argument is without merit.

"The standard of appellate review of a trial court's denial of a motion for a directed verdict or motion for judgment notwithstanding the verdict is the any evidence test." (Citation and punctuation omitted.) *Bailey v. Annistown Road Baptist Church*, 301 Ga. App. 677, 685 (5) (689 SE2d 62) (2009). In general, an employer is not responsible for the torts of its independent contractor. OCGA § 51-2-4. An exception to this rule exists, however, "[i]f the employer ratifies the unauthorized wrong of the independent contractor." OCGA § 51-2-5 (6). See also *Jones v. Ceniza*, 257 Ga. App. 806, 808 (1) (572 SE2d 362) (2002). Whitaker Farms' claim fails because it presumes that receipt of a benefit is the only way to prove ratification by an employer. Ratification can be either express, or implied from: (1) slight acts of confirmation by the employer; (2) silence or acquiescence of the employer; *or* (3)

10

where the employer receives and holds the benefits of an unauthorized wrong. See

*Merritt v. Marlin Outdoor Advertising*, 298 Ga. App. 87, 91 (2) (b) (679 SE2d 97)

(2009); *Medley v. Boomershine Pontiac-GMC Truck*, 214 Ga. App. 795, 798-799 (4)

(449 SE2d 128) (1994); *Kelley v. Carolina Life Ins. Co.*, 48 Ga. App. 106 (171 SE

847) (1933). See also *Greenwald v. Kersh*, 265 Ga. App. 196, 198-201 (1) (593 SE2d

381) (2004) (general contractor's acceptance of work by independent contractor

amounted to ratification of tortious act); *Chipley v. Beeler*, 122 Ga. App. 781, 782 (1)

(178 SE2d 767) (1970) (homeowner ratified conduct of county by accepting the

work). "Whether ratification occurred is usually a question for the jury." *Medley*, 214

Ga. App. at 798 (4).

In this case, there was ample evidence for the jury to conclude that Whitaker

Farms, as owner of the property, ratified Hynes' wrongful conduct. Whitaker knew

that (a) Lennon had occupied the Baby Gold orchard and harvested peaches on it for

at least a decade; (b) Hynes had locked the gates of the peach orchard where

Fitzgerald Farms was harvesting its peaches; and (c) any delay in harvesting could

result in destruction of the crop. Nevertheless, Whitaker neither instructed Hynes to

unlock the gates on August 4 – thus allowing Lennon and his workers to return to the

property – nor stopped Hynes from relocking the gate the following morning. Instead,

11

Whitaker ignored Lennon's phone call and Fitzgerald Farms' complaint for a temporary restraining order, and proceeded to file a criminal arrest warrant against Lennon to keep him off the property. The verdict was supported by the record. See *Stinespring v. Fields*, 139 Ga. App. 715, 717 (1) (229 SE2d 495) (1976) (trial court correctly denied motion for directed verdict where there was evidence supporting ratification).

2. Whitaker Farms next contends that there is no evidence to support an award of attorney fees under OCGA § 13-6-11 because (a) the award was based on mere guesswork; (b) the associate attorney representing Fitzgerald Farms did not testify; and (c) fees were awarded on Fitzgerald Farms' abandoned claim for unjust enrichment. We disagree.

"Under Georgia law, expenses of litigation and attorney fees may be awarded, pursuant to OCGA § 13-6-11, if the fact-finder determines the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." (Citation, punctuation and footnote omitted.) *Atlanta Emergency Svcs. v. Clark*, 328 Ga. App. 9, 13 (2) (761 SE2d 437) (2014). See also *Jones*, 257 Ga. App. at 809 (5). "The question of attorney fees under OCGA § 13-6-11 is a question for the jury." *KDS Properties v. Sims*, 234 Ga. App. 395, 400 (5) (506

12

SE2d 903) (1998). This Court will affirm such an award if there is any evidence to support it. See *Mize v. McGarity*, 293 Ga. App. 714, 720 (6) (667 SE2d 695) (2008) ("intentional tort of trespass will support a claim for expenses of litigation and attorney fees under OCGA § 13-6-11 [because] the intentional nature of the trespass gives rise to the bad faith necessary for such recovery") (citation, punctuation and footnote omitted).

Fitzgerald Farms' principal attorney testified as to his experience and the experience of his associate who performed a majority of the work, their billing rates, the number of hours both spent on the case, as well as the amount anticipated in trial fees. He presented invoices to support the fee request, stated that the incurred fees were reasonable, and explained that the total amount included reductions for work on the counterclaims as well as the claim for unjust enrichment. Counsel for Whitaker Farms cross-examined the attorney about the reasonableness of his rates.

There was ample evidence presented to support the award. Counsel testified as to his associate's involvement and confirmed that the fees did not include the claim for unjust enrichment. As for Whitaker Farms' complaint that the trial fees were based on mere guesswork, defense-counsel never cross-examined or challenged the attorney's assessment on this issue. "Since this [testimony] was not objected to or

13

controverted by [Whitaker Farms], it authorized the jury to find that the fee charged was reasonable in this case." *Carpet Transport v. Kenneth Poley Interiors*, 219 Ga. App. 556, 558 (2) (a) (466 SE2d 70) (1995).

3. Whitaker Farms last complains that the award of attorney fees was unreasonable because it was "excessive[ly] out-of-market." We disagree.

It is well established that a party's "attorney himself is competent to testify as to his opinion on reasonable fees." (Citation and punctuation omitted.) *Campbell v. Bausch*, 195 Ga. App. 791, 792 (2) (b) (395 SE2d 267) (1990). Compare *Gray v. King*, 270 Ga. App. 855, 858 (2) (b) (608 SE2d 320) (2004) (no evidence as to reasonableness of attorney fees presented even though testimony from own attorney would have sufficed). As discussed in Division 2, supra, Fitzgerald Farms' counsel testified to his experience and his hourly rate, as well as the experience and hourly rate of his associate. He explained that the associate, who was billed out at a lower rate, did a majority of the work in the case, and testified that he specialized in agriculture law and that the rates charged were reasonable. On cross-examination, counsel explained that his rates were reasonable given the complexity of the case and "aggressive nature" of the opponent. The trial court reduced the amount of attorney

14

fees awarded by the jury to the amount requested by Fitzgerald Farms and proved by counsel. The award was supported by the evidence and was not unreasonable.

*Case No. A18A1421*

4. In its cross-appeal, Fitzgerald Farms contends that the trial court erred in withdrawing the issue of punitive damages from the jury and in refusing to instruct the jury on punitive damages. We agree.

(a) We first address Whitaker Farms' claim that Fitzgerald Farms' unconditional acceptance of the reduced judgment bars it from asserting its cross-appeal under *InterAgency, Inc. v. Danco Financial Corp.*, 203 Ga. App. 418, 429 (6) (417 SE2d 46) (1992) (physical precedent only), citing *Sparks v. Aetna Ins. Co.*, 62 Ga. 198 (1879), and conclude that the cross-appeal is not barred. In *InterAgency*, the plaintiff/cross-appellant accepted a write-off of the attorney fees award and then sought to appeal the write-off. In this case, Fitzgerald Farms is not appealing the reduction of the attorney fees award to which it agreed. Rather, it is appealing the issue of punitive damages related to its trespass claim, which is in no way related to its request for attorney fees under OCGA § 13-6-11.

Federal law provides guidance, albeit non-binding, on this issue. Federal courts follow the longstanding rule reiterated by the Supreme Court in *Donovan v. Penn*

15

*Shipping Co.*, 429 U. S. 648 (97 SCt 835, 51 LE2d 112) (1977) (per curiam), "that a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted." Id. at 650 (2, 3). The *Donovan* rule, however, "does not prevent the appeal of issues that are separate or distinct from the issue on which a plaintiff has accepted a remittitur." *Cohen v. Yale-New Haven Hosp.*, 800 A2d 499, 504 (I) (Conn. 2002) (dismissing appeal where plaintiff accepted remittitur reducing non-economic, compensatory damages judgment and then sought additional non-economic, compensatory damages). See *Utah Foam Products Co. v. Upjohn Co.,* 154 F3d 1212, 1216 (I) (10th Cir. 1998) (pointing out that *Donovan* permits party who has accepted remittitur on one cause of action to appeal issues related to other causes of action not subject to remittitur order). While we recognize that a plaintiff in state court is not bound by *Donovan*, the rationale for the exception to its application, is persuasive. We therefore find, based upon the particular facts and circumstances of this case, that Fitzgerald Farms' claim for attorney fees under OCGA § 13-6-11 is separate and distinct from its cause of action

16

for compensatory and punitive damages based on its trespass claim. Accordingly, we reject Whitaker Farms' contention that this cross-appeal is barred.[7]

(b) Under OCGA § 51-12-5.1 (b), punitive damages may be awarded in tort actions where "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." "A conscious indifference to consequences relates to an intentional disregard of the rights of another." *Tyler v. Lincoln*, 272 Ga. 118, 120 (1) (527 SE2d 180) (2000). See also *Oglethorpe Power Corp. v. Sheriff*, 210 Ga. App. 299, 301 (4) (a) (436 SE2d 14) (1993). Trespass is an intentional act which will authorize a claim for punitive damages. See *Tyler*, 272 Ga. at 120 (1). "Ordinarily, the imposition of punitive damages is a question for the jury." *Baumann v. Snider*, 243 Ga. App. 526, 530 (3) (532 SE2d 468) (2000).

The actions taken by Whitaker Farms and its owner, as laid out in Division 1, supra, are sufficient evidence of "conscious indifference" to authorize a jury to award punitive damages. See *Baumann*, 243 Ga. App. at 530-531 (3) (reversing grant of

---

[7] Had Fitzgerald Farms accepted a reduced compensatory damages award our conclusion might be different.

motion for directed verdict on plaintiff's claim for punitive damages in action for trespass); *T. G. & Y. Stores Co. v. Waters*, 175 Ga. App. 884, 887-888 (3) (334 SE2d 910) (1985) (affirming denial of motion for directed verdict on claim for punitive damages in action for trespass). See also *Langlois v. Wolford*, 246 Ga. App. 209, 210-212 (1) (539 SE2d 565) (2000) (affirming denial of motion for directed verdict on punitive damages claim). Whitaker allowed the gates to Fitzgerald Farms' orchard to remain locked while Fitzgerald Farms' peach harvest rotted, and he not only refused to unlock the gates despite Lennon's pleas to finish harvesting the peaches, but sought to have Lennon arrested and kept him off the property to prevent Fitzgerald Farms from completing the harvest. The trial court's ruling on this issue is reversed.

*Judgment affirmed in Case No. A18A1420; reversed in Case No. A18A1421. Miller, P. J., and Goss, J., concur.*