**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 9, 2023**

# In the Court of Appeals of Georgia

A23A0020. ATLANTIC STAR FOODS, LLC v. BURWELL.

MILLER, Presiding Judge.

Mark Burwell suffered a severe allergic reaction after eating mushrooms served at a Hardee's restaurant which is owned and operated by Atlantic Star Foods, LLC. He filed a negligence action against Atlantic Star, and a jury awarded him compensatory and punitive damages in a total amount of $474,000. Atlantic Star now appeals, contending that (1) the trial court erred by failing to give its requested jury charge on causation; (2) the trial court erred by denying its motion for directed verdict on the issue of punitive damages; and (3) the trial court erred by failing to declare an "impasse" or mistrial. Because none of these arguments are availing, we affirm.

"Following a jury verdict, we view the evidence in the light most favorable to the prevailing party." (Citation omitted.) *Cajun Contractors, Inc. v. Peachtree Prop. Sub, LLC*, 360 Ga. App. 390 (861 SE2d 222) (2021).

So viewed, Burwell was the personal driver and bodyguard for Safa Al-Qaysi. On September 16, 2016, Burwell drove Al-Qaysi to a Hardee's restaurant, which is owned and operated by Atlantic Star. Initially, Burwell and Al-Qaysi placed burger orders at the callbox, at which time Burwell told the callbox attendant that he was allergic to mushrooms, and the attendant directed them to park and enter the restaurant.

Once inside, Al-Qaysi and Burwell were the only customers in the restaurant. Al-Qaysi ordered four mushroom and Swiss cheese burgers, and Burwell ordered a Frisco burger. Burwell asked the attendant at the counter that his meal be separated from Al-Qaysi's because he was allergic to mushrooms, and the night manager, who was present at the time, repeatedly heard Burwell warn that he was "highly" and "severely" allergic to mushrooms. Burwell further explained that the two orders could not be cross-contaminated while they were being prepared, and the attendant responded, "[o]kay." The cook then came to the counter and said, "[o]kay, . . . not a problem." Burwell insisted that the food could not get "confused" or "mixed up," and

2

the cook told him not to worry, and he offered to place his burger in a separate bag from Al-Qaysi's burgers. While Burwell was informing of his allergy, the night manager told him "[o]kay," and the cook reassured the night manager, "I got it, no problem, I got it." After the burgers were prepared, the cook brought the orders to the counter in two separate bags — a larger bag and a smaller bag — and he reassured Burwell that "it was taken care of." Video cameras captured the preparation of the food, but despite receiving a "notice of claim" letter from Burwell, Atlantic Star did not preserve the footage.[1]

While in the car, Burwell began eating the burger from the smaller bag, and then felt a slimy substance. Al-Qaysi took the burger, turned on the car light, and observed that Burwell's burger contained mushrooms. Burwell turned the car around, returned to the restaurant, and informed the night manager that there were mushrooms on his burger. While en route to a pharmacy, Burwell felt his throat closing up, had difficulty breathing, and was unable to swallow. He was transported to the emergency room at Northside Hospital, during which time he began losing consciousness. Burwell was treated at the hospital overnight and was released in the early hours of

---

[1] As a spoliation sanction, the jury was instructed that the appellant failed to preserve the footage in bad faith and that there was a rebuttable presumption that the footage was harmful.

September 17. Later that morning, however, he felt weak, could not breathe properly, and complained of stroke-like symptoms, and he was readmitted to the hospital for several more days. He was released from his job as Al-Qaysi's personal driver and bodyguard on September 17.

Atlantic Star has a detailed allergen awareness policy, which is set forth in a reference sheet as follows:

> At Carl's Jr. & Hardee's, we want the "Person in Charge (General Manager or Shift Leader/Shift Manager) of each work shift to be knowledgeable and aware of potential Food Allergies. Here are the important points we want every Person In Charge to know: . . . Even trace amounts of an Allergen in food can cause a severe reaction. Cross Contact between an Allergen and other food products can cause an allergic reaction if consumed. . . . Follow these guidelines if a Guest informs you they have a food allergy OR asks about a specific allergen: NEVER tell a Guest "No" a food does not contain the allergen in question. That's because many of our products contain these foods in their ingredients [] and all products are prepared in the same kitchen area. ALWAYS direct the Guest to the Allergen Chart in the restaurant or on the Carl's Jr. & Hardee's websites and inform them that we do not have an allergen free cooking environment, so there is a possibility of cross contamination. . . . DO NOT ATTEMPT TO ANSWER ANY GUEST QUESTIONS ON YOUR OWN - ONLY DIRECT THE GUEST TO THE AVAILABLE INFORMATION. The policy repeatedly cautions that severe allergic reactions can be fatal, and it also

instructs that "Guests with Food Allergies aren't simply stating their food preference; they have a condition that prevents them from safely eating some foods."

Burwell filed a complaint against Atlantic Star, asserting claims for negligence, gross negligence, failure to train and supervise employees, and punitive damages.[2] At trial, Dr. Frederick Cogen, a board certified allergist and allergy doctor for approximately 42 years, was admitted as an expert witness. He explained that an allergy reaction occurs on a spectrum, from mild to severe, and that when the reaction is severe, it is called anaphylaxis, which can lead to kidney failure and death. Having examined the ambulance report and the records from both hospital stays, Dr. Cogen concluded that Burwell has "an advanced and significant" allergy to mushrooms. He testified that, after ingesting the mushrooms from the Hardee's restaurant, Burwell had upper airway obstruction and cardiovascular collapse and suffered biphasic or protracted anaphylaxis. In his view, Burwell suffered an initial wave of anaphylaxis, his condition improved slightly and he was released from the hospital prematurely, and Burwell then exhibited "multiple" symptoms which were again consistent with

---

[2] Burwell named numerous other defendants in the complaint, but Atlantic Star was the only remaining defendant at the time of trial.

biphasic anaphylaxis, requiring re-hospitalization. Although Burwell suffers from low blood potassium levels, Dr. Cogen opined that low potassium was not the cause of Burwell's second hospital visit.

After a week-long trial, the jury rendered a verdict in Burwell's favor. The jury awarded him $299,000 in compensatory damages and $175,000 in punitive damages and assigned 85% fault to Atlantic Star and 15% fault to Burwell. The trial court entered judgment on the verdict, and Atlantic Star now appeals.

1. First, Atlantic Star argues that the trial court erred by failing to give its requested charge pertaining to causation, which it claims was tailored to the evidence because the majority of Burwell's treatment during his second hospital visit concerned a pre-existing condition, which is hyperaldosteronism and/or low blood potassium levels. We conclude that the trial court's charges substantially covered the principles in the charge requested by Atlantic Star, and therefore the trial court did not err in its instructions.

In reviewing a trial court's refusal to give a requested jury instruction, we examine "the jury charge as a whole, and if the jury charge as a whole accurately and fully apprised the jury of the law to be applied in its deliberations, then the refusal to give an additional instruction, even if that additional instruction were accurate, does

not amount to error." (Citation omitted.) *Burdette v. McDowell*, 321 Ga. App. 507, 509 (2) (739 SE2d 28) (2013). We have previously explained that a trial court's refusal to give a jury charge in "the exact language" requested by a party is not error where the charges actually given substantially cover the principles contained in the request. *Nails v. Rebhan*, 246 Ga. App. 19, 21 (3) (538 SE2d 843) (2000).

(a) Atlantic Star requested the following charge:

I charge you that the defendant is not responsible for any physical infirmities which you may find the plaintiff had or now has which were due to causes other than the alleged incident involved in this case. If you find that the plaintiff had or now has some injury, pain or discomfort which is attributable to other natural causes and not to this incident, the plaintiff could not hold the defendant responsible therefor. The plaintiff must go further and satisfy your minds by a preponderance of the evidence that the alleged incident in this case was the legal or proximate cause of his infirmities, if any.

The trial court, nonetheless, fully charged the jury on negligence and proximate cause. First, the court instructed that "[t]he plaintiff must prove that the defendant was negligent in one or more ways alleged in order to recover. . . . If you find no negligence at all on the part of the defendant, then the plaintiff's case against the defendant ends." The court then charged the jury that

7

[n]o [p]laintiff may recover for injuries or disabilities that are not connected with the act or omissions of the defendant in this case. There can be no recovery for a particular [p]laintiff for an injury or disability that was not proximately caused by the incident in question. If you should find that at the time of the incident, the plaintiff had any physical condition, element, or disease that was becoming apparent or was dormant, and if you should find that as a result of the negligence of the defendant and that the injury resulted in any aggravation of a condition already pending, then the plaintiff could recover damages for aggravation of the pre-existing condition. The trial court elaborately defined the principle of proximate cause, and the jury was further instructed that "[t]he proof offered by the plaintiff must establish a connection between the act or acts of negligence charged and the injury alleged before the plaintiff can be permitted to recover."

Considering these excerpts as a whole, we conclude that the charges given by the trial court sufficiently conveyed to the jurors that, in order to render a verdict in Burwell's favor, they were required to find that his injuries were attributable to Atlantic Star's negligence (as opposed to some other factor) and that this negligence proximately caused Burwell's injuries. As the trial court properly recognized, these are the same legal principles underlying the charge requested by Atlantic Star. Therefore the trial court did not err in declining to give the requested charge.

(b) Atlantic Star nonetheless insists that the jury was confused by the portion of the charge concerning the aggravation of a pre-existing condition because it awarded Burwell compensation for medical expenses for the entire hospital stay, even though there was no evidence that the allergy event aggravated any low blood potassium associated with the second stay. This argument is unsubstantiated for various reasons.

First, the portion of the instruction concerning the aggravation of a pre-existing condition was an accurate statement of the law. See, e.g., *Warnock v. Sandford*, 349 Ga. App. 426, 431 (825 SE2d 922) (2019). Second, the jury was entirely aware that this case involved a question of whether the allergy event aggravated or triggered Burwell's pre-existing medical condition of low blood potassium. During direct examination of a physician who attended to Burwell during his second hospital stay, Atlantic Star's counsel asked whether an allergy event could "exacerbate" existing health issues and whether Burwell's allergic reaction "triggered" some of the complaints associated with the second stay. This same treating physician was then cross-examined on whether an allergic reaction might cause low blood potassium. Burwell's medical expert was also questioned on whether an allergic reaction can cause a decrease in blood potassium levels. Third, the fact that the jury awarded

9

Burwell medical expenses for both hospital stays is not indicative of any confusion. Instead, the jury could have simply believed the testimony of Burwell's expert, that mushroom ingestion — and not low blood potassium — caused the second hospital stay. Dr. Cogen explained that *both* hospital stays involved symptoms that were consistent with biphasic anaphylaxis and that the entire ordeal was "one long" allergy event that occurred on a "continuous spectrum." The record also contains evidence that Burwell returned to the hospital because he still was not breathing properly and his tongue was blocking his airway, and the treating physician testified that this was "[d]efinitely" a typical symptom of an allergic reaction or anaphylaxis. Accordingly, it is not evident that the jury was confused by the charges, and the trial court did not err in declining to give the jury charge requested by Atlantic Star.

2. Next, Atlantic Star argues that the trial court erred by denying its motion for directed verdict on the issue of punitive damages. Having considered the evidence, we determine that Atlantic Star was not entitled to a directed verdict on this issue.

"Ordinarily, the imposition of punitive damages is a question for the jury." (Citation omitted.) *Whitaker Farms, LLC v. Fitzgerald Fruit Farms, LLC*, 347 Ga. App. 381, 389 (4) (b) (819 SE2d 666) (2018). Under Georgia law, employers may be vicariously liable for punitive damages arising from the acts or omissions of their

10

employees if such tortious conduct is committed in the course of the employer's business, within the scope of the employment, and is sufficient to authorize a recovery of punitive damages under OCGA § 51-12-5.1. *Fowler v. Smith*, 237 Ga. App. 841, 843 (2) (516 SE2d 845) (1999). Punitive damages may be awarded in tort actions where the defendant's actions showed either wantonness or that entire want of care which would raise the presumption of conscious indifference to consequences. OCGA § 51-12-5.1 (b). Wanton conduct "is so reckless or so charged with indifference to the consequences" that it is "the equivalent in spirit to actual intent." *Wardlaw v. Ivey*, 297 Ga. App. 240, 242 (1) (676 SE2d 858) (2009). "Conscious indifference to consequences involves an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights." (Punctuation omitted.) Id. "When reviewing a jury's verdict that the plaintiff is entitled to punitive damages, an appellate court considers whether there is any evidence to support the jury's verdict under the 'clear and convincing' standard." *Taylor v. Devereux Foundation, Inc.*, __ Ga. ___,___ (VI) (Mar. 15, 2023), S22A1060, 2023 WL 2519243, at *26 (Ga. Mar. 15, 2023).

The record contains evidence that Burwell informed Atlantic Star's staff of his allergy at least four times, and the night manager recalled him repeatedly saying that

11

he was "highly" and "severely" allergic to mushrooms. Additionally, the jury could have inferred that the night manager was not actually trained on any policy, procedure, or required response when a customer informs of a food allergy. The general manager explained that, under the company's allergen policy, the cook should not have assured that Burwell's burger would be free of mushrooms, and that if an individual had alerted him to a serious mushroom allergy, he would have told the customer that the restaurant contained mushrooms and advised against eating there. The policy is also clear that Burwell was supposed to have been told that there was a possibility of cross-contamination. But the night manager testified that if a customer indicated that they were allergic to a specific food item, there was "no procedure for that." When asked about how the restaurant handled the potential for cross-contamination of foods, he answered, "there's no procedure for nothing like that," and he explained that his training on cross-contamination solely concerned handling raw food.[3]

The jury also heard evidence that allergies are "extremely common," affecting approximately one in every eight people, and Atlantic Star's own allergen policy

---

[3] The staff was trained via videos and modules, and the general manager did not know whether the videos referenced the allergen policy. The cook did not testify to being trained on the policy.

states, "Food Allergies are a common but serious condition that affects many of our Guests." The jury could have also found that Atlantic Star knew of the gravity of a serious allergic reaction in customers because its policy repeatedly states that severe allergic reactions can be deadly. As the policy also acknowledges, many of the restaurant's food items contain allergens, the food items are all prepared in the same area, and the restaurant does not have an allergen free cooking environment. Yet, there was evidence that Atlantic Star did not train all the employees or "persons in charge" on the allergen and cross-contamination procedures discussed above, and despite Burwell's repeated and vociferous warnings that he was severely allergic to mushrooms, the staff accepted his order and served him mushrooms. Further, Atlantic Star's staff reassured Burwell, on multiple occasions, that his food would not contain mushrooms. This evidence was sufficient for the jury to find that Atlantic Star acted wantonly or with a conscious indifference to consequences. See *Taylor*, supra, __Ga. at ___ (VI), *27 (despite evidence that tended to support the reasonableness of the defendant's training policies, the jury could have concluded that the plaintiff presented clear and convincing evidence that the defendant's actions demonstrated an "entire want of care which would raise the presumption of conscious indifference to consequences").

13

Therefore, the trial court properly denied Atlantic Star's motion for directed verdict on punitive damages and correctly submitted this issue to the jury.

3. Lastly, Atlantic Star argues that the trial court abused its discretion by not declaring an "impasse" or a mistrial in this case. This failure, Atlantic Star complains, risked the safety of a holdout juror and forced her to surrender her will for the sake of obtaining a verdict. We conclude that the trial court committed no abuse of discretion in not declaring an "impasse" or mistrial.[4]

"Unless it is apparent that a mistrial is essential to preservation of the right of fair trial, the discretion of the trial judge [to declare a mistrial] will not be interfered with." (Citation omitted.) *Clack v. Hasnat*, 354 Ga. App. 502, 507 (3) (841 SE2d 210) (2020).

When the jury was deliberating on the issue of punitive damages, the bailiff told the trial court that one of the jurors, "Juror C," reported feeling "uncomfortable" and indicated that the deliberations had become "heated." The trial court brought Juror C into the courtroom for questioning, and she stated that she did not feel safe

---

[4] Burwell argues that Atlantic Star did not actually request a mistrial and essentially desired for the trial court to declare a mistrial sua sponte. Regardless, as we discuss more fully below, there was no abuse of discretion on the part of the trial court.

expressing her opinion, that she did not believe that the jurors could have a mutually respectful conversation, and that she did not think that they could reach an agreement or conclusion without bullying and harassment. According to her account, multiple jurors were yelling and expressing differing opinions, and she could not "process" the "emotional high-pitched loud voices" in the jury room. She explained that a juror had been called "childish" and that the jurors had addressed the commotion, "taken [it] as [a] joke and laughed at it, and [tried] to move on," but everyone was stressed, the conversation was not "civilized," and she did not want to continue deliberating. Juror C did not feel physically threatened, but she stated, "I feel like unless I just give up my own opinion and go with whatever the loud voices dictate then I don't think I can be heard."

After noting that the jury had been deliberating on punitive damages for only a brief period, the trial court questioned Atlantic Star on its position. Counsel responded, "our position would be she's telling us they're at an impasse. I know that's totally up to the [c]ourt what it wants to do[.]" When questioned on a remedy, counsel restated that the jury was at an impasse and then added, "that's the [c]ourt's decision as to what the [c]ourt wants to do." Following a brief recess and another extended conference with the attorneys, the trial court brought the jurors into the

15

courtroom. The trial judge explained that he would have them return on the following Monday to continue deliberating, but several jurors voiced childcare concerns because of the impending Christmas break. The trial court gave the jury an *Allen*[5] charge, the jury then reached a unanimous verdict on the issue of punitive damages, and the jury was polled.

Given the above, the trial court properly exercised its discretion in not declaring an "impasse" or mistrial. First, as the trial court aptly observed, the jury heard four days of evidence and then deliberated on punitive damages for less than an hour before indicating a potential impasse. Certainly, the fact that the jury had not yet engaged in lengthy deliberations on punitive damages weighed against the declaring of a mistrial. Second, based on Juror C's own account, the jurors had been attempting to make light of the charged and argumentative nature of their deliberations and move toward a consensus on their verdict. See *Meadows v. State*, 303 Ga. 507, 515 (2) (d) (813 SE2d 350) (2018) (explaining, albeit in the criminal context, that heated debate and contentious deliberations can be expected in jury deliberations, with jurors placing "all sorts of pressures" on one another). Third, the trial court carefully contemplated and pursued various courses of action to ascertain

---

[5] *Allen v. United States*, 164 U. S. 492, 501 (17 SCt 154, 41 LEd 528) (1896).

16

whether the jury was truly at an impasse. The trial judge initially allowed the jurors "a few more minutes" of deliberations to "see how things [would] go." Then, in addressing the jurors directly, the trial judge acknowledged that they may have been "tired" after a week-long trial and stated his intention to have them return the following Monday, but several of the jurors voiced childcare concerns due to the Christmas break. Finally, after the trial court elected to give the *Allen* charge, deliberations proceeded with no further indication of any impasse. We conclude that the record in this case evinces the trial court's deliberate and careful assessment as to whether the circumstances truly demanded a mistrial, and its ultimate decision to not declare an "impasse" or mistrial was simply not an abuse of discretion. See *Beasley v. Beasley*, 248 Ga. App. 491, 493-494 (2) (546 SE2d 871) (2001) (trial court did not place "undue pressure" on the jury to reach a unanimous verdict where they did not announce a deadlock and their total deliberation time of less than eight hours did not "reflect a true impasse").[6]

---

[6] Atlantic Star insists that there was juror coercion because Juror C was not allowed to ask a question during the polling of the jurors and another juror desired to "abstain" from the verdict. We reject this argument because both jurors affirmed, without equivocation, that the verdict on punitive damages was freely and voluntarily entered, that it was their verdict in the jury room, and that it was still their verdict at the time of polling.

17

Because the trial court did not commit any reversible error, we affirm the jury's verdict and the trial court's judgment in Burwell's favor.

*Judgment affirmed. Mercier and Hodges, JJ., concur*.