**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 1, 2025**

# In the Court of Appeals of Georgia

A23A0438. WHITAKER FARMS, LLC v. FITZGERALD FRUIT FARMS, LLC.

GOBEIL, Judge.

This is the third appearance of this case in this Court. Fitzgerald Farms, LLC sued Whitaker Farms, LLC for trespass, punitive damages, and attorney fees, and Whitaker Farms countersued. In *Whitaker I*, we affirmed the original jury verdict awarding $150,000 in compensatory damages and $272,000 in attorney fees to Fitzgerald Farms. *Whitaker Farms, LLC v. Fitzgerald Fruit Farms, LLC*, 347 Ga. App. 381 (819 SE2d 666) (2018) ("*Whitaker I*"). We determined, however, that the trial court erred in precluding punitive damages, and we thus remanded the case to the trial court to conduct a punitive damages trial. Id. at 389 (4) (b). The trial court conducted such trial, and in *Whitaker II*, we affirmed the second jury verdict awarding $500,000

in punitive damages and $200,000 in attorney fees to Fitzgerald Farms. *Whitaker Farms, LLC v. Fitzgerald Fruit Farms, LLC*, 368 Ga. App. 563 (890 SE2d 454) (2023) ("*Whitaker II*"). Thereafter, the Supreme Court granted certiorari and vacated our opinion in *Whitaker II. Whitaker Farms, LLC v. Fitzgerald Fruit Farms, LLC*, 320 Ga. 208 (908 SE2d 531) (2024) ("*Whitaker III*"). On remand, the Supreme Court has instructed us to consider whether the erroneous admission of certain evidence was harmful such that a new trial on punitive damages is required. Id. at 220 (4). For the reasons set forth below, we find that the error was not harmless. We thus vacate the jury verdict, and remand the case to the trial court for a new trial on the issue of punitive damages.

This case stems from an incident that occurred in August 2016. We will discuss the evidence from the punitive damages trial in more detail below (and the background facts are well summarized in our previous opinions) but, briefly, Fitzgerald Farms (owned by Sean Lennon, or "Lennon"), brought an action against Whitaker Farms (owned by Curtis Whitaker, or "Whitaker"). Lennon asserted that he had the right to use a 20-acre tract of land located on Whitaker Farms's property, based on an agreement made between Lennon and Walter "Hynes" Barnes, the son of the tract's

2

previous owner, that was later reduced to a written lease. Lennon alleged Whitaker Farms trespassed on this tract of land by locking Fitzgerald Farms's employees into and later out of a peach orchard that was ready for harvest. Fitzgerald Farms sought no less than $90,000 in actual damages, $250,000 in punitive damages, and attorney fees pursuant to OCGA § 13-6-11. Before trial, the trial court determined that Fitzgerald Farms could not seek punitive damages because Whitaker was not the person who actually committed the actions constituting the trespass. The parties proceeded to a jury trial (the "original jury trial"), and the jury awarded Fitzgerald Farms $150,000 in compensatory damages and $400,000 in OCGA § 13-6-11 attorney fees, which was reduced by the trial court to $272,000. On appeal, we found that the trial court erred by withdrawing the issue of punitive damages from the jury and in refusing to instruct the jury on punitive damages. *Whitaker I*, 347 Ga. App. at 389 (4) (b). We otherwise affirmed the jury's verdict. Id. at 385-388 (1), (2), (3).

On remand, the parties proceeded to a second trial (the "punitive damages trial"), which took place over five days in January 2022. At the conclusion of the punitive damages trial, the jury awarded Fitzgerald Farms $500,000 in punitive

damages and $200,000 in attorney fees. On appeal, we affirmed this verdict in full. *Whitaker II*, 368 Ga. App. at 572 (4).

The Supreme Court granted certiorari on whether statements Whitaker made during a settlement negotiation were properly admitted under OCGA § 24-4-408 ("Rule 408"), which governs the admissibility of settlement offers and statements made during settlement negotiations. *Whitaker III*, 320 Ga. at 208. At the punitive damages trial, Lennon testified that he and Whitaker met one-on-one before a deposition, and Lennon believed that the two "were going to come away with an agreement, a settlement[.]" However, according to Lennon, Whitaker threatened him with criminal prosecution, and told him that he "thrived" off of this type of litigation and intended to make an example out of Lennon. *Whitaker II*, 368 Ga. App. at 566 (1) (a). We held that this testimony was admissible because it was relevant to the limited purpose of Whitaker's intent and state of mind toward Lennon, which was relevant to the punitive damages question. Id. at 567-568 (1) (a). The Supreme Court disagreed with this reasoning, finding that Whitaker's statements were admitted for the purpose of proving Whitaker Farms's liability for punitive damages, which is forbidden under Rule 408. *Whitaker III*, 320 Ga. at 218-220 (3). Accordingly, the Supreme Court

4

vacated *Whitaker II* and remanded the case to this Court to "address whether the erroneous admission of the evidence was harmful such that a new trial on punitive damages is required." *Whitaker III*, 320 Ga. at 220 (4).

Under the harmless error doctrine, we must assess whether evidentiary errors are actually harmful before reversing the judgment of the trial court. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."); OCGA § 9-11-61. "When we consider whether an error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Altine v. Eastside Med. Ctr., LLC*, 372 Ga. App. 475, 476 (904 SE2d 396) (2024) (citation and punctuation omitted). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. at 480 (citation and punctuation omitted). On appeal, the burden is on the appellant to establish not only error, but also harm to require reversal. *Lamb v. Javed*, 303 Ga. App. 278, 282 (2) (692 SE2d 861) (2010).

Based upon our review of the punitive damages trial record in this case, we cannot conclude that it is highly probable that this erroneously admitted evidence did

not contribute to the verdict. In order to achieve a verdict for punitive damages, Fitzgerald Farms was required to prove by clear and convincing evidence that Whitaker Farms's actions (via Whitaker's actions) showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. OCGA § 51-12-5.1 (b).

In assessing the question on appeal, certain parts of the record are worth highlighting. First, after informing the jury that this trial was being held strictly on the issue of punitive damages, the trial court read to the jury a series of stipulated factual statements describing the original dispute and highlighted that Whitaker Farms was found by a previous jury to be liable for trespass and interference with Fitzgerald Farms's peach crop that resulted in damages to Fitzgerald Farms. The jury then heard from several witnesses, including Lennon, who testified about how he came to lease the 20 acres on what became the Whitaker Farms property. He explained that he had worked for its previous owner, Carroll Farms, for many years and made a deal with Hynes (part owner of Carroll Farms's owner and its manager) to grow a specific type of peach on those acres. Lennon also purchased a separate tract of land previously owned by Hynes at a foreclosure sale. The jury heard that Whitaker and Hynes were

unhappy about Lennon's purchase of the latter acreage, as Whitaker had tried to purchase it himself, and Hynes was hoping to one day have a chance to buy it back from Whitaker.

The jury also heard from Justin Hammock, a corporal with the Meriwether County's Sheriff's Office, that Whitaker was aware of Lennon's claim to use the 20-acre tract. In April 2016, Whitaker tried to make a criminal complaint against Lennon for uprooting some trees on that tract, but Hammock informed him that it was a civil matter. Hammock and his supervisor testified that Whitaker was adamant about arresting Lennon for these actions despite being told repeatedly that nothing criminal had occurred.

According to Lennon, he and his employees took all of their normal measures to prepare for the 2016 peach harvest, doing everything in the open as they always had done, and making no attempt to conceal their actions. Lennon testified about the day of the trespass, where Hynes locked several Fitzgerald Farms employees inside of the orchard and then refused to unlock the gate. Lennon texted Hynes and asked him to open the gate, but Hynes responded that Lennon would have to talk to Whitaker, the new owner of the property. Hynes shared Whitaker's phone number with Lennon.

Lennon then called Whitaker and left a voicemail, Whitaker never responded. Hynes testified that he informed Whitaker about Lennon's message, but Whitaker took no action. Lennon testified that he had to get a court order so his employees could be freed. He also requested an injunction so he could return to harvest his crop without fear of further interference by Whitaker Farms. And the jury heard that, despite his knowledge of Lennon's claim to those 20 acres, Whitaker opposed the injunction, allowing the peaches to rot on the trees before the matter could be resolved. The jury also heard that Whitaker Farms could not have harvested those peaches even if they had wanted to; Hynes testified that they did not have the manpower to do so, nor a buyer for that specific type of peach.

Further, Whitaker filed a counter lawsuit for more than one million dollars and swore an application for a criminal warrant against Lennon. Lennon testified about the distress he and his wife suffered due to their fear of criminal charges coming against him. Ultimately, due to the stress of the situation, Lennon decided to relinquish the land and the peach trees on that orchard to Whitaker Farms.

During the punitive damages trial, the jury heard the forbidden evidence about a meeting between Lennon and Whitaker. Specifically, Lennon testified that he met

with Whitaker and believed they could come to a settlement, to "just part ways" and "eat . . . whatever fees or costs we had incurred[.]" However, Whitaker told him it was within his (Whitaker's) right to bring up the criminal charges again and that Lennon should think about his family. Lennon testified that Whitaker told him that he "thrived" off of this type of litigation and that he had bankrupted another person with similar litigation. Lennon testified that he offered to walk away from the litigation and that Whitaker responded by saying that he was going to make an example out of Lennon.

The jury heard about more actions taken by Whitaker after the original trespass. For example, Whitaker Farms chainsawed the trees on the Fitzgerald Farms acres, rendering them essentially dead as crop trees. Whitaker also allowed many acres of Whitaker Farms to go to waste, failing to maintain the acres previously used by Fitzgerald Farms and other parts of the farm. During Whitaker's cross-examination, the jury heard about Whitaker's deposition, in which he refused to rule out attempting to bring new criminal charges against Lennon.

The jury also heard directly from Whitaker, who testified that he purchased the land at issue and what remained of Carroll Farms in October 2015. He denied knowing

about Lennon's lease over the 20-acre tract at the time of the purchase, stating that he believed Lennon to be an employee of Hynes's. Whitaker testified that he learned about Lennon's connection to the tract in spring 2016 after Lennon took down some trees on that land. He agreed that the sheriff's deputies referred him to civil court to resolve the dispute and that he asked them to tell Lennon to stay off the property, but he denied insisting upon Lennon's arrest. Whitaker testified that he believed the issue was resolved — because the deputies told him they would speak to Lennon, and then he did not see or hear about Lennon on the property again until August.

As to the day of the lockout, Whitaker testified that Hynes forwarded to him Hynes's exchange with Lennon about unlocking the gate. Whitaker also spoke to Hynes on the phone shortly thereafter, and received the voicemail from Lennon asking for Whitaker to call him. Whitaker testified that he did not remember if he heard the voicemail that same day or the next day, but the message "didn't have any sense of urgency to it," and he denied understanding the implications of what was happening at the time He testified that he sought criminal charges against Lennon because he wanted Lennon to stay off the property. He stated that he hired an attorney and followed his advice regarding the civil and criminal litigation. Regarding the

10

improperly admitted testimony about what Whitaker told Lennon at their settlement conference, Whitaker flatly denied making such statements. To the contrary, Whitaker testified that he would have "liked to have had a walk-away" agreement with Lennon. After this portion of the trial, the jury returned a verdict finding liability for punitive damages against Whitaker Farms. The trial court then turned to the amount of punitive damages that should be awarded, and later to attorney fees.

Based on this evidence and the rest of the evidence presented at the punitive damages trial, we agree with Lennon that there were several different pieces of evidence that likely influenced the jury's verdict finding that Fitzgerald Farms was entitled to punitive damages. Notably, there was evidence that Whitaker was aware of Lennon's claim to use the 20-acre tract – at the very least – months before the day of the lockout. There was evidence that two law enforcement officers informed Whitaker that his dispute with Lennon over the land was a civil matter rather than a criminal one, and yet he still attempted to bring criminal charges against Lennon twice, and refused to rule out bringing them again in his deposition. There was evidence that Whitaker Farms could not have harvested and sold the contested

11

peaches even if it had wanted to, and yet Whitaker and Hynes prevented Lennon from harvesting them and Whitaker sued him for their value.

However, this evidence was disputed. From his perspective, although Whitaker knew Lennon was asserting a claim to the land, he did not agree that Lennon actually had a right to those peaches. He stated that he subjectively believed that Lennon was interfering with his land and his property, and he stated that he was advised by his attorney that the criminal charges were the best way to keep Lennon off what he believed to be his land. And the evidence about Whitaker's knowledge of the actual lockout is mixed. It is clear that Whitaker was aware Lennon was trying to get into a gate and get in touch with him, but he denied understanding that people were locked in the gate or that peaches were going to waste. Hynes may have understood these facts, but it was not definitively established whether Whitaker did or did not, given his denial. Further, Whitaker attributed many of his actions concerning the criminal charges and the civil litigation to following the advice of his attorneys.

Given these disputes in the evidence presented to the jury, we find that the impact of the improperly admitted evidence was likely significant. Whitaker's alleged statements that he thrived off of the continued litigation and intended to bankrupt or

make an example out of Lennon were direct evidence of malicious intent. Whereas much of the other evidence of the motive behind Whitaker's actions could be attributed to miscommunication or ignorance. Indeed, Fitzgerald Farms pointed to this evidence in both opening statements and closing arguments, noting during closing arguments that these statements were "great evidence of intent[.]" And, as explained in *Whitaker III*, the jury was instructed to consider this evidence specifically for the forbidden purpose of deciding Whitaker Farms's liability for punitive damages. 320 Ga. at 218-220 (3); see also *Whitaker II*, 368 Ga. App. at 567 (1) (a). Thus we do not find that there was other evidence sufficiently strong enough to combat the forbidden settlement conference evidence that would render its introduction harmless in this case. See *Altine,* 372 Ga. App. at 480-481 (considering the overall strength of the case when deciding that improperly admitted settlement negotiation evidence was harmless; ultimately finding the forbidden evidence was subject to a limiting instruction and was offset by other overwhelming evidence in support of the winning party's case).

Accordingly, we vacate the judgment entered on the jury verdict in this case and remand the case for further proceedings not inconsistent with this opinion.

*Judgment vacated and case remanded. Doyle, P. J., and Padgett, J., concur.*